# STATE OF LOUISIANA
# COURT OF APPEAL, THIRD CIRCUIT

## 14-708

**STATE OF LOUISIANA**

**VERSUS**

**JAIME BROOKS DAY**

\*\*\*\*\*\*\*\*\*\*

APPEAL FROM THE
FOURTEENTH JUDICIAL DISTRICT COURT
PARISH OF CALCASIEU, NO. 15589-10
HONORABLE CLAYTON DAVIS, DISTRICT JUDGE

\*\*\*\*\*\*\*\*\*\*

## JOHN D. SAUNDERS
## JUDGE

\*\*\*\*\*\*\*\*\*\*

Court composed of John D. Saunders, Jimmie C. Peters, and James T. Genovese, Judges.

**CONVICTION AFFIRMED. SENTENCE VACATED. REMANDED FOR RESENTENCING.**

Peters, J., concurs in the result.

Genovese, J., dissents.

**John F. DeRosier**
**Fourteenth Judicial District**
**District Attorney**
**Karen C. McLellan**
**Fourteenth Judicial District**
**Assistant District Attorney**
**P. O. Box 3206**
**Lake Charles, LA 70602-3206**
**(337) 437-3400**
**COUNSEL FOR APPELLEE:**
     **State of Louisiana**

**William T. Fontenot**
**Fontenot & Fontenot**
**523 Clarence Street**
**Lake Charles, LA 70601**
**(337) 491-3864**
**COUNSEL FOR DEFENDANT/APPELLANT:**
     **Jaime Brooks Day**

**SAUNDERS, Judge**

Jaime Brooks Day (hereafter "Defendant") appeals her conviction for second degree cruelty to a juvenile for which she was sentenced to thirty years hard labor with credit for time served. For the following reasons, we affirm the conviction, but vacate the sentence and remand to the trial court for resentencing.

## FACTS AND PROCEDURAL HISTORY

On December 16, 2008, G.H. was placed in the custody of his father and Defendant, his step-mother, following allegations of abuse by his biological mother.[1] Defendant's husband was frequently away from the home, leaving her alone to care for G.H. and the children of Defendant and the biological father of G.H. Following a report of child abuse, Calcasieu Parish Sheriff's Deputies went to Defendant's residence on February 19, 2010, and Defendant and her husband brought G.H. to the hospital. Defendant was charged in an indictment filed on April 8, 2010, with three counts of second degree cruelty to a juvenile, a violation of La.R.S. 14:93.2.3, and five counts of cruelty to a juvenile, a violation of La.R.S. 14:93.[2] Defendant entered a plea of not guilty on April 9, 2010.

On November 4, 2013, the State amended the indictment, noting its intent to proceed to trial on one count of second degree cruelty to a juvenile instead of three counts and striking five counts of cruelty to a juvenile. On the same day, the jury was selected and trial began. Multiple fact and expert witnesses testified at trial.

On November 13, 2013, the jury found Defendant guilty of second degree cruelty to a juvenile. On December 6, 2013, Defendant was sentenced to serve thirty years at hard labor, with credit for time served. A motion for appeal was

---

[1] The initials of the victim is used in accordance with La.R.S. 46:1844(W).

[2] Defendant's husband, Murry Dalton Day was charged in the same indictment. He filed a motion to sever, which was granted on June 22, 2011.

filed and granted on December 17, 2013. A motion to reconsider sentence was filed on January 2, 2014, and denied without hearing on January 7, 2014.

## ASSIGNMENTS OF ERROR:

Defendant now appeals her conviction and sentence and asserts the trial court erred:

1. by allowing the prosecution to publish only the portion of a home video that favored their case, but not the portion favoring Defendant;

2. in failing to grant a mistrial after the investigating deputy coached a witness in the midst of her testimony;

3. allowing the state's expert to testify outside the field of pediatrics and tell the jury that Defendant was guilty of child abuse;

4. by excluding as hearsay the school principal's reason for rejecting G.H.'s application for admission into the private school;

5. allowing an employee of the Department of Child and Family Services with no first-hand knowledge of the underlying facts to tell the jury that Jaime committed child abuse;

6. by the allowing G.H. to testify by closed circuit television without allowing Defendant to have G.H. examined to assess the necessity of his closed circuit testimony; and

7. failing to give adequate reasons for the imposition of a thirty-year sentence.

## ERRORS PATENT:

In accordance with La.Code Crim.P. art. 920, we have reviewed the record for errors patent on the face of the record and find none.

## ASSIGNMENT OF ERROR NO. 1:

In her first assignment of error, Defendant contends the trial court erred by allowing the prosecution to show to the jury only four minutes of a video approximately twenty-five minutes long in total, which she contends she made to prove to mental health authorities how mentally ill G.H. was, in an effort to secure the long-term care he needed. The portion of the video withheld from the jury

shows G.H. clawing his face, punching himself, announcing his desires to harm himself, screaming, and telling Defendant he will miss her. It shows her telling G.H. not to hurt himself, to calm down, and that she will miss him should he be placed in long-term care. She contends the latter shows the extent of G.H.'s mental illness, his efforts to harm himself, and presents her in a "better light."

## New Trial

Defendant asserts the portion shown to the jury was inflammatory because it "made her look horrible and made G.H. look like a normal child crying for his mother." While the video was being played, one of the jurors asked, "Do we have to watch this?" After this question, the court requested the video be paused, and the prosecution announced it had shown all they wanted to show. Defendant contends the inflammatory impact was evident by the fact that a juror had an outburst during the viewing of the video. Defense counsel had no objection to the admissibility of the videotape. Nonetheless, Defendant asserts that showing only a portion of the video was unduly prejudicial and that La.Code Crim.P. art. 851(5) allows for a grant of new trial in this situation, where "the ends of justice would be served."

In pertinent part, La.Code Crim.P. art. 851 provides:

> The motion for a new trial is based on the supposition that injustice has been done the defendant, and, unless such is shown to have been the case the motion shall be denied, no matter upon what allegations it is grounded.

> The court, on motion of the defendant, shall grant a new trial whenever:

> . . . .

> (5) The court is of the opinion that the ends of justice would be served by the granting of a new trial, although the defendant may not be entitled to a new trial as a matter of strict legal right.

3

Defendant did not file a motion for new trial in this matter. Pursuant to La.Code Crim.P. art. 851 (emphasis added), the court shall grant a new trial **"upon motion of the defendant."** Thus, in the absence of a timely motion by Defendant, this court cannot grant a new trial pursuant to La.Code Crim.P. art. 851(5).

## Contemporaneous objection

Defendant contends the contemporaneous objection rule does not preclude raising this issue on appeal because a "substantial right" was affected, citing *State v. Langston*, 43,923 (La.App. 2 Cir. 2/25/09), 3 So.3d 707, *writ denied*, 09-696 (La. 12/11/09), 23 So.3d 912; *State v. Montoya*, 340 So.2d 557 (La.1976); *State v. Williamson*, 389 So.2d 1328 (La.1980); *State v. Green*, 493 So.2d 588 (La.1986); and *State v. Arvie*, 505 So.2d 44 (La.1987), in support of her argument.

Louisiana Code of Criminal Procedure Article 841(A) provides "[a]n irregularity or error cannot be availed of after verdict unless it was objected to at the time of occurrence." However, "[e]rrors that affect substantial rights of the accused are reviewable by the appellate court, even absent contemporaneous objection, to preserve the 'fundamental requirements of due process.' *State v. Williamson*, *supra*; *State v. Green*, *supra*." *Langston*, 3 So.3d at 715. Generally, only errors that are structural may be reviewed in the absence of contemporaneous objection. *State v. Hongo*, 96-2060 (La. 12/2/97), 706 So.2d 419. A structural error is one that, "by its very nature, impacts the entire framework of the trial from beginning to end, without reference to any other trial consideration." *State v. Langley*, 06-1041, pp. 12-13 (La. 5/22/07), 958 So.2d 1160, 1168, *cert. denied*, 552 U.S. 1007, 128 S.Ct. 493 (2007).

In *Montoya*, 340 So.2d 557, on direct examination, the arresting officer made reference to defendant's post-arrest silence. The court held this to be

reversible error because it violated the defendant's constitutional right to remain silent under *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602 (1966).

In *Arvie*, 505 So.2d at 47-48 (footnotes omitted), our supreme court explained:

> On very rare occasions, this court has refused to apply the contemporaneous objection rule as a bar to review of an error which was so fundamental that it struck at the very essence of the reliability of the fact-finding process. In *State v. Williamson*, 389 So.2d 1328 (La.1980), the judge instructed the jury on the essential elements of first and second degree murder as those crimes were defined under statutes which had been amended to redefine the crimes before the date of the charged crime. Apparently the prosecution and the defense shared the court's misconception, and there were no objections to the instruction. This court reversed the conviction, despite the absence of a contemporaneous objection, noting that a substantial error in the very definition of the charged crime was of such importance and significance as to violate the fundamental requirements of due process.

> In *State v. Green*, 493 So.2d 588 (La.1986), this court again considered an error to which no contemporaneous objection had been made at trial. During Green's trial on the charge of third offense theft, the trial judge failed to instruct the jurors that they were to consider Green's prior theft convictions only for the purpose of sentence enhancement and not for the purpose of determining his guilt or innocence. Although defense counsel failed to request such an instruction or to object to its omission, this court considered the error and reversed the conviction. This court's unanimous opinion noted that the Court in *Spencer v. Texas*, 385 U.S. 554, 87 S.Ct. 648, 17 L.Ed.2d 606 (1967) had approved the constitutionality of a procedure which allowed evidence both of the current offense and of prior convictions of similar crimes at the guilt determination trial *only* because of the procedural requirement in the statutory scheme that the jury must be instructed to consider the prior crimes only for the purpose of sentence enhancement and not for the purpose of deciding guilt or innocence of the charged crime. Because Louisiana's statute arguably was facially unconstitutional without the requirement of a limiting instruction, this court held that the failure to give such an instruction required reversal, even without a contemporaneous objection.

Because Defendant did not request that the entirety of the video be played for the jury, she is ordinarily precluded from raising the alleged error for review on appeal. *See* La.Code Crim.P. art. 841. The exceptions to the contemporaneous

5

objection rule arose in cases involving the defendant's post-arrest silence, an incorrect definition of the charged crime, and jury instructions. Because the claim raised by Defendant does not involve a structural error, the exception to the contemporaneous objection rule is inapplicable to the claim set forth in this assignment of error. Thus, review of the error at issue was waived.

### Ineffective Assistance of Counsel

Defendant also alleges that defense counsel's failure to object to the State's failure to play the entire videotape constituted ineffective assistance of counsel.

> In *State v. Griffin*, 02–1703, pp. 8–10 (La.App. 4 Cir. 1/15/03), 838 So.2d 34, 40, our brethren of the Fourth Circuit, with whom we agree, reviewed the law applicable to claims of ineffective assistance of counsel stating as follows:

> > Generally, the issue of ineffective assistance of counsel is a matter more properly addressed in an application for post conviction relief, filed in the trial court where a full evidentiary hearing can be conducted. *State v. Prudholm*, 446 So.2d 729 (La.1984); *State v. Johnson*, 557 So.2d 1030 (La.App. 4 Cir.1990); *State v. Reed*, 483 So.2d 1278 (La.App. 4 Cir.1986). Only if the record discloses sufficient evidence to rule on the merits of the claim do the interests of judicial economy justify consideration of the issues on appeal. *State v. Seiss*, 428 So.2d 444 (La.1983); *State v. Ratcliff*, 416 So.2d 528 (La.1982); *State v. Garland*, 482 So.2d 133 (La.App. 4 Cir.1986); *State v. Landry*, 499 So.2d 1320 (La.App. 4 Cir.1986).

> > The defendant's claim of ineffective assistance of counsel is to be assessed by the two part test of *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984); *State v. Fuller*, 454 So.2d 119 (La.1984). The defendant must show that counsel's performance was deficient and that he was prejudiced by the deficiency. . . . The defendant must make both showings to prove that counsel was so ineffective as to require reversal. *State v. Sparrow*, 612 So.2d 191, 199 (La.App. 4 Cir.1992).

> > This Court has recognized that if an alleged error falls "within the ambit of trial strategy" it does not "establish ineffective assistance of counsel." *State v. Bienemy*, 483 So.2d 1105 (La.App. 4 Cir.1986).

> Moreover, as "opinions may differ on the advisability of a tactic, hindsight is not the proper perspective for judging the competence of counsel's trial decisions. Neither may an attorney's level of representation be determined by whether a particular strategy is successful." *State v. Brooks*, 505 So.2d 714, 724 (La.1987).

*State v. Schexnaider*, 03–144, pp. 17–18 (La.App. 3 Cir. 6/4/03) 852 So.2d 450, 462.

Defendant has failed to meet her burden of proving that defense counsel was ineffective for failing to object to the State's failure to play the entire videotape. We have reviewed the video and find that it was well within the realm of reasonable trial strategy not to show the entirety of it to the jury. While the video, in some parts, showed a concerned step-parent, as a whole, it does not evoke sympathy for Defendant. In its entirety, it is more inflammatory than probative. Further, Dr. Scott Benton, an expert in child abuse pediatrics, testified that the video was likely staged, as it showed a child with a relatively controlled tantrum. Defense counsel was justified in refusing to object to showing only part of the video to the jury. There is simply no evidence that defense counsel was deficient. Additionally, there is no evidence that Defendant was prejudiced, given the highly inflammatory nature of the video.

For the foregoing reasons, we find that Defendant cannot now request a new trial, that she waived her right to request review of her claim that the trial court erred in allowing the State to publish only a portion of the videotape by failing to object at trial, and that all claims of ineffective assistance of counsel lack merit.

**ASSIGNMENT OF ERROR NO. 2:**

In her second assignment of error, Defendant contends the trial court erred in not declaring a mistrial after the investigating deputy coached a material eyewitness in the midst of her testimony.

7

Evelyn Vincent, a homebound teacher who had been teaching G.H. in Defendant's home, testified at Defendant's trial. A recess was taken during Vincent's testimony, during which Detective Elizabeth Zaunbrecher approached the witness. Defendant alleges Detective Zaunbrecher provided Vincent with information and asserts that Vincent changed her testimony concerning a particular incident during her last visit to G.H.'s home. Defendant argues that Detective Zaunbrecher had been observing Vincent's testimony and expressed her approval that Vincent adopted one version of the events on her last home visit, rather than an earlier version.

When the encounter came to the attention of the trial court, Vincent was questioned and stated that Detective Zaunbrecher said that Vincent was "doing a good job." The trial court found Detective Zaunbrecher's behavior inappropriate and excused her from the courtroom and the trial. The jury was then returned to the courtroom, and the cross-examination of Vincent continued. Defendant argues that what occurred was a direct violation of the trial court's sequestration order and should have been grounds for a new trial pursuant to La.Code Crim.P. art. 851, which mandates the granting of a new trial where the ends of justice would be served.

Louisiana Code of Criminal Procedure Article 775 provides:

A mistrial may be ordered, and in a jury case the jury dismissed, when:

(1) The defendant consents thereto;

(2) The jury is unable to agree upon a verdict;

(3) There is a legal defect in the proceedings which would make any judgment entered upon a verdict reversible as a matter of law;

(4) The court finds that the defendant does not have the mental capacity to proceed;

8

(5) It is physically impossible to proceed with the trial in conformity with law; or

(6) False statements of a juror on voir dire prevent a fair trial.

Upon motion of a defendant, a mistrial shall be ordered, and in a jury case the jury dismissed, when prejudicial conduct in or outside the courtroom makes it impossible for the defendant to obtain a fair trial, or when authorized by Article 770 or 771.

A mistrial shall be ordered, and in a jury case the jury dismissed, when the state and the defendant jointly move for a mistrial.

"A mistrial is a drastic remedy and, except in instances in which a mistrial is mandatory, is warranted only when trial error results in substantial prejudice to defendant, depriving him of a reasonable expectation of a fair trial." *State v. Smith*, 04-340, p. 5 (La.App. 5 Cir. 10/26/04), 888 So.2d 280, 285.

Again, Defendant did not move for a new trial. For the same reasons articulated in our analysis of her first assignment of error, she cannot now request one. Additionally, Defendant did not move for a mistrial. Where a defendant does not request a mistrial and no grounds exist for the trial court to order a mistrial *sua sponte*, the trial court does not err in failing to grant one. *State v. Passman*, 345 So.2d 874 (La.1977). Further, even had Defendant moved for mistrial, it would not have been error for the trial court to deny the motion. The remarks made by Detective Zaunbrecher did not make it impossible for Defendant to obtain a fair trial. The incident was brief and brought to the attention of the trial court, which admonished Detective Zaunbrecher and excused her from the courtroom. Further, defense counsel questioned Vincent about the discrepancies in her versions of the events. Thus, Defendant did not suffer any prejudice. In light of the foregoing, we find that the trial court did not err in failing to grant a mistrial.

For the foregoing reasons, we find this assignment of error lacks merit.

## ASSIGNMENT OF ERROR NO. 3:

In her third assignment of error, Defendant contends that the trial court erred in allowing the State's expert pediatrician to testify outside his field of medical pediatrics and tell the jury that she was guilty of abuse. Defendant asserts that when Dr. McCanless was asked for his medical diagnosis and other medical questions, he spontaneously said that he and OCS believed that G.H. was abused, which was outside the scope of pediatrics. Defendant alleges that Dr. McCanless admitted that all of his information came from OCS, and he had talked to no one else about G.H. Defense counsel objected to the testimony wherein Dr. McCanless stated: "I think those are the marks that we felt were made from the ligatures around his ankle when they were tied up -- and supposedly hung by his ankle." That objection was sustained by the trial court. Defense counsel did not object to the other testimony cited in brief to this court.

Defendant asserts that Dr. McCanless's testimony should have been excluded because: 1) it was based on multiple levels of hearsay and violated her constitutional right to confront her accusers; 2) it exceeded the field of pediatrics; 3) it violated La.Code Evid. art. 703 when he based his opinion as to abuse on what OCS told him rather than upon medical evidence "of a type reasonably relied upon by experts in a particular field"; and 4) regurgitating OCS's abuse allegations and cloaking them as a medical diagnosis violated La.Code Evid. art. 702, which precludes testimony that is not scientific, technical, or otherwise specialized knowledge that would assist the trier of fact. Defendant contends that the ends of justice would be served by the granting of a new trial pursuant to La.Code Crim.P. art. 851(5), that the contemporaneous objection rule does not preclude the raising of this issue on appeal because it affected a substantial right, and trial counsel's failure to object constituted ineffective assistance of counsel.

10

On appeal, Defendant asserts for the first time that the testimony of Dr. McCanless should not have been admitted. However, "[a] new basis for objection cannot be raised for the first time on appeal." *State v. Fowlkes*, 352 So.2d 208, 211 (La.1977) (citing La.Code Crim.P. art. 841; *See also State v. Johnson*, 438 So.2d 1221, 1225 (La.App. 3 Cir. 1983). Thus, Defendant cannot now attempt to avail herself of the alleged error. *See also State v. Klein*, 351 So.2d 1158 (La.1977). The alleged error does not affect the "entire framework of the trial from beginning to end, without reference to any other trial consideration." *Langley*, 958 So.2d at 1168. As previously mentioned, Defendant did not move for a new trial. For the same reasons articulated in our analysis of her first assignment of error, she cannot now request one.

Finally, we find that Defendant has failed to meet her burden of proof on her claim that failure to object to Dr. McCanless' testimony constitutes ineffective assistance of counsel because she has not alleged that defense counsel's performance fell below an objective standard of reasonableness under prevailing professional norms. Further, she has not alleged any prejudice. Both prongs of the test set out in *Strickland*, 466 U.S. 668, must be satisfied in order to find ineffective assistance of counsel. *State v. Truehill*, 09-1546 (La.App. 3 Cir. 6/2/10), 38 So.3d 1246. Her "[g]eneral statements and conclusory allegations will not suffice to prove a claim of ineffective assistance of counsel." *State v. Celestine*, 11-1403, p. 5 (La.App. 3 Cir. 5/30/12), 91 So.3d 573, 577 (citing *State v. Camp*, 46,052 (La.App. 2 Cir. 3/16/11), 59 So.3d 548, *writ denied*, 11–954 (La. 12/16/11), 76 So.3d 1199.)

For the foregoing reasons, we find Defendant waived review of her claim that the trial court erred in allowing testimony outside of Dr. McCanless' field. We further find that her claim of ineffective assistance of counsel on the grounds

that her attorney failed to object to Dr. McCanless' testimony lacks merit. Therefore, we find this assignment of error is without merit.

## ASSIGNMENT OF ERROR NO. 4:

In her fourth assignment of error, Defendant contends that the trial court erred when it sustained the prosecution's objection to questions by defense counsel to her regarding the reasons given to her by a school principal concerning the rejection of G.H.'s application for entry into private school. Defendant asserts that the prosecution accused her of deliberately favoring her biological sons by enrolling them in a private school. Defense counsel asked the reason why G.H. was not enrolled in the private school, and the prosecution objected. Defendant contends that the State objected on the basis of hearsay and argues her testimony should have been admitted. Defendant asserts the testimony was relevant to prove her reason for enrolling G. H. into a different school than her biological sons. Thus, "it goes to her 'state of mind.'" She contends La.Code Crim.P. art. 851(2) provides that the court shall grant a new trial in situations where its ruling on an objection made during the proceedings shows prejudicial error.

La.Code Evid. art. 803 provides, in pertinent part:

> The following are not excluded by the hearsay rule, even though the declarant is available as a witness:
>
> . . . .
>
> **(3) Then existing mental, emotional, or physical condition.** A statement of the declarant's then existing state of mind, emotion, sensation, or physical condition (such as intent, plan, motive, design, mental feeling, pain, and bodily health), offered to prove the declarant's then existing condition or his future action. A statement of memory or belief, however, is not admissible to prove the fact remembered or believed unless it relates to the execution, revocation, identification, or terms of declarant's testament.

The prosecution did not set forth the basis for its objection to Defendant's testimony. Additionally, defense counsel did not object to the trial court's ruling.

12

On appeal, she asserts for the first time that the testimony should be admitted. "A new basis for objection cannot be raised for the first time on appeal. LSA-C.Cr.P. art. 841. *State v. Fowlkes*, 352 So.2d 208 (La.1977)." *Johnson*, 438 So.2d at 1224-25. Thus, Defendant cannot now attempt to avail herself of the alleged error. *See also Klein*, 351 So.2d 1158. Furthermore, no motion for new trial was filed in this matter. Consequently, for the same reasons articulated in our analysis of her first assignment of error, this court cannot grant a new trial pursuant to La.Code Crim.P. art. 851(2).

For the foregoing reasons, we find this assignment of error lacks merit.

## ASSIGNMENT OF ERROR NO. 5:

In her fifth assignment of error, Defendant contends that the trial court erred by allowing a governmental "bureaucrat with no first-hand knowledge of the underlying facts to tell the jury that [she] committed child abuse."

Lee Schmidt, an employee of the Department of Child and Family Services (hereafter "DCFS"), testified that unnamed persons called DCFS on several separate occasions and claimed that Defendant abused G.H., that DCFS concluded that she committed the abuse, that there was a pattern of abuse, and, as a result, DCFS removed G.H. from the home and placed him in foster care. Defendant contends that the testimony was prejudicial and that Schmidt was allowed to testify based on DCFS's records and not upon any first-hand information. Defendant notes that Schmidt admitted she was merely the district manager and that the supervisor and the worker completed the work. Thus, she asserts that Schmidt's testimony was based upon multiple levels of hearsay and violates the confrontation clause, the hearsay rules, and La.Code Evid. art. 701(1)'s requirement that the testimony of lay witnesses be limited to those events that they have perceived firsthand. She asserts that La.Code Crim.P. art. 851(5) supports her argument that

13

a new trial should be granted because the ends of justice would be served thereby, that the contemporaneous objection rule does not preclude the raising of this issue on appeal because it affected a substantial right, and defense counsel was ineffective for failing to object.

Defense counsel did not object to Schmidt's testimony. Moreover, we note that when Schmidt refused to answer the State's questions at trial, defense counsel specifically stated he had no objection to the court's order requiring her to answer said questions. Because the claim raised by Defendant does not involve a structural error, the exceptions to the contemporaneous objection rule are inapplicable to the claim set forth in this assignment of error. Thus, review of the alleged error at issue was waived. Furthermore, no motion for new trial was filed in this matter. Thus, for the reasons articulated in our analysis of Defendant's first assignment of error, this court cannot now grant one.

Defendant also alleges that defense counsel's failure to object constituted ineffective assistance of counsel. However, we find Defendant has failed to meet her burden of proof on her claim of ineffective assistance of counsel. Defendant has not alleged that defense counsel's performance fell below an objective standard of reasonableness under prevailing professional norms. Further, she has not alleged any prejudice. Her "[g]eneral statements and conclusory allegations will not suffice to prove a claim of ineffective assistance of counsel." *Celestine*, 91 So.3d at 579.

For the foregoing reasons, we find this assignment of error lacks merit.

**ASSIGNMENT OF ERROR NO. 6:**

In her sixth assignment of error, Defendant contends that the trial court erred by denying her constitutional right to confront her accuser face-to-face by allowing G.H. to testify by closed circuit television without allowing her to have her own

child psychology expert examine G.H. as to the necessity of his closed circuit testimony.

On August 15, 2011, the State filed a motion to utilize closed circuit television during the testimony of G.H. in accordance with La.R.S. 15:283. In response, Defendant filed a motion to retain her own psychologist to examine G.H. as to the necessity of his testimony via closed circuit television. The State opposed the request. A hearing on Defendant's motion was held on November 2, 2011, and the trial court denied Defendant's motion, stating the following:

> I find it unnecessary and not appropriate to allow a third expert, regardless of who's retaining them, to interview the child for the same purpose. We have two experts, they agree on it, we're going to not put the victim through anymore [sic] than we have to, we have enough. We assume the experts are impartial, they're experts, and so they've made their conclusions, and I'm not going to – I'm going to deny the motion.

At a hearing on the State's motion on December 20, 2011, defense counsel thoroughly questioned Dr. Dilks, a neuropsychologist who had examined G.H. Defense counsel called Ann Landry, a licensed clinical social worker. Dr. Dilks testified that, if required to testify in the presence of Defendant, G.H. "would [not] be open and thorough in his memories" and that he would "shut down" and "withdraw into himself." He explained that children who experience trauma often develop these problems and that it "would be very negative to his testimony." He further testified that it was "not only a possibility . . . [but] a probability" that testifying in the presence of Defendant would cause G.H. to have an adverse reaction and that it would "intensify and exacerbate" his already severe emotional distress. Finally, he testified that he employed standard protocol in evaluating G.H. and that his approach would have not have differed regardless of who hired him to provide testimony. Ann Landry stated that her testimony concerning the propriety of having G.H. testify in the presence of Defendant did not differ from Dr. Dilks.

15

The trial court found that G.H. would be allowed to testify via closed circuit television. Defendant did not object to the trial court's ruling on the State's motion and has not asked this court to review that ruling. However, Defendant asserts that she "deserves a new trial, before which she must be given an opportunity to have G.H. independently examined prior to any determination that closed circuit television is necessary." Defendant asserts the trial court's refusal to allow her to have G.H. examined by her own expert violates her constitutional right to confront her accuser and that the constitutional violation was not harmless.

The trial court's determination whether to allow a child victim to testify by closed circuit television is subject to review for abuse of discretion. *State v. Daniels*, 484 So.2d 941 (La.App. 1 Cir. 1986).

As our supreme court explained in *State v. Welch*, 99-1283, pp. 4-6 (La. 4/11/00), 760 So.2d 317, 320-21 (footnote omitted):

> The Confrontation Clause of the Sixth Amendment to the United States Constitution provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." This right provides " 'two types of protections for a criminal defendant: the right physically to face those who testify against him, and the right to conduct cross-examination.' " *Coy v. Iowa*, 487 U.S. 1012, 1017, 108 S.Ct. 2798, 2801, 101 L.Ed.2d 857 (1988). However, public policy considerations and necessities may take precedence over "face-to-face" confrontation. *Maryland v. Craig*, 497 U.S. 836, 849, 110 S.Ct. 3157, 3165, 111 L.Ed.2d 666 (1990).
>
> . . . .
>
> In *Craig*, the Supreme Court found an exception for child witnesses in child abuse cases:
>
>> Accordingly, we hold that, if the State makes an adequate showing of necessity, the state interest in protecting child witnesses from the trauma of testifying in a child abuse case is sufficiently important to justify the use of a special procedure that permits a child witness in such cases to testify at trial against a defendant in the absence of face-to-face confrontation with the defendant.

> *Craig*, 497 U.S. at 855, 110 S.Ct. at 3169. However, the Court held that this finding of necessity must be a case-specific one. The trial court must hear evidence and determine whether the special procedure is necessary to protect the child witness from trauma caused by the presence of the defendant.

Where there is a finding of necessity, there is no confrontation clause violation. *Welch*, 760 So.2d 317. "In the child-victim case where all elements of confrontation are preserved except the ability of the witness to see the defendant and the jury, the constitutional mandate is satisfied." *Daniels*, 484 So.2d at 944.

Although we could find no jurisprudence directly addressing Defendant's assignment of error, we find several cases instructive. In our review of the jurisprudence, we find no cases wherein a defendant was allowed to have an expert perform an independent psychological or physical examination of a victim. We summarize the jurisprudence we find instructive below.

In *State v. Edwards*, 419 So.2d 881 (La.1982), the supreme court held the trial court properly denied a defendant's request for medical and psychological examinations of a child victim to determine his competency as a witness. In *State v. Allen*, 26,547 (La.App. 2 Cir. 12/7/94), 647 So.2d 428, *writ denied*, 95-48 (La. 5/19/95), 654 So.2d 1352, the second circuit held the defendant was not entitled to an independent psychiatric evaluation of a child victim despite the claims that the child had been "coached" by her mother. In *State v. Abbott*, 29,497 (La.App. 2 Cir. 6/18/97), 697 So.2d 636, *writ denied*, 97-1929 (La. 1/9/98), 705 So.2d 1097, the second circuit denied a defendant's motion for an independent medical examination of the victim, which the defendant contended was necessary for his defense.

In *State v. Galliano*, 05-962 (La.App. 5 Cir. 8/29/06), 945 So.2d 701, *writ denied*, 06-2367 (La. 4/27/07), 955 So.2d 682, the defendant claimed the trial court erred in denying his motion for an independent medical examination of the victim

prior to sentencing, which defendant claimed would have demonstrated the child's current physical condition, which was relevant for sentencing because the trial court stated that the child's medical condition was the main reason it intended to impose a maximum sentence. The trial court denied the motion, stating it had heard from three doctors with regard to the child's injuries, his current condition, and his prognosis. In addressing this claim, the fifth circuit found:

> In *State v. Gerhart*, 583 So.2d 843 (La.App. 5 Cir.1991), this Court held that the trial judge did not err in denying the defendant's request for an independent medical examination of a child sex abuse victim and rejected the defendant's claim that his right to present a defense was abridged by the lack of an independent medical examination. The *Gerhart* court noted that the child had been examined by a physician accepted by the trial court as an expert in pediatrics and child sexual abuse, who testified at trial. Further, the court noted that the defendant "merely sought an independent medical examination to perhaps obtain a more favorable result concerning the cause of the victim's injury." *Id.* at 845.
>
> Although *Gerhart* is not directly on point, since the asserted purpose for the medical exam here was for sentencing, not to put on a defense, we find the *Gerhart* case to be instructive. As in *Gerhart*, the defendant herein has not demonstrated any prejudice in the trial court's denial of his motion for an independent medical examination of the victim. Further, it is reasonable to infer that the defendant herein, as was the case in *Gerhart*, merely sought the medical examination to obtain a more favorable result concerning the severity of Christopher's injuries. In addition, the record contains ample evidence of Christopher's condition as of the time of trial in December 2004, only a few months before the sentencing in March of 2005.
>
> Considering the foregoing, we find that the trial judge did not err in denying the motion for a medical examination of the child abuse victim in this case.

*Id.* at 729.

Finally, in *State v. Garay*, 453 So.2d 1003 (La.App. 4 Cir. 1984), the defendant alleged his constitutional rights to present an effective defense and to confront the witnesses against him were prejudiced by the trial court's denial of an

18

independent psychiatric examination of the child sexual abuse victim. The fourth circuit explained:

> Defendant was granted his alternative request. He received all records from St. Vincent's eighteen days before the trial. He was provided an opportunity to question Brenda regarding her ability to distinguish between prior sexual abuse and the present case when her competency to testify was considered immediately prior to the commencement of defendant's trial. The trial court carefully evaluated Brenda and concluded that she was a competent witness. That judgment deserves great weight. *State v. Francis*, 337 So.2d 487 (La.1976). Brenda's trial testimony demonstrated a clear recollection of the factual details of the recent incidents with defendant. *See State v. Nails*, 255 La. 1070, 234 So.2d 184 (1970). This recollection was distinct from that of experiences she had earlier in her home situations. Additionally, defendant was afforded the channel of cross-examination to further test the clarity of Brenda's recollection.

*Id.* at 1006.

The testimony of Dr. Dilks and Ms. Landry regarding G.H.'s ability to testify in the presence of Defendant support the trial judge's determination to allow G.H. to testify by closed circuit television without another examination by an expert engaged by Defendant. Dr. Dilks testified that he employed standard procedures in evaluating G.H. and that he would not have used any different procedure, regardless of who hired him to provide testimony. Ann Landry stated that her testimony did not differ. The law overwhelmingly supports allowing child victims to avoid the imposition of unnecessary independent examinations and the extra trauma associated with testifying in the presence of their alleged abusers. Further, Defendant has not demonstrated any prejudice to her defense in the trial court's denial of her motion. "[A]ll elements of confrontation [were] preserved [during G.H.'s testimony] except the ability of [G.H.] to see the defendant and the jury." *Daniels*, 484 So.2d at 944. Therefore, there can be no prejudice in the procedure employed, regardless of whether Defendant was denied her request for an independent examination of G.H.

For these reasons, we find that the trial court did not err in refusing to allow Defendant to compel an independent examination of G.H.

## ASSIGNMENT OF ERROR NO. 7:

In her seventh assignment of error, Defendant contends that the trial court failed to give adequate reasons for the imposition of a thirty-year sentence on a first-felony offender whom the trial court found was not a threat. Defendant was convicted of second degree cruelty to a juvenile, which is punishable by imprisonment at hard labor for not more than forty years. La.R.S. 14:93.2.3. Defendant was sentenced to serve thirty years at hard labor. At sentencing, the trial court stated:

> I don't accept that Ms. Day is a threat. I think the circumstances that were thrust upon her, she was unable to handle. And, unfortunately, for her, her method of handling [G.H.] was to practically kill him.
>
> And I put a great weight on the testimony and the letter that I've received from Dr. Benton. He was perhaps the other star in this case from the standpoint of being able to explain the unexplainable, which is how do custodians, stepparents, or parents mistreat a child in this way? There's a fundamental point that he made -- and I think Dilks made it, too -- which is that children don't starve themselves.
>
> If you accept that, and I do, and I think you have to accept that, then the defense kind of crumbles, because this child was not starving himself, he was being starved, and I don't know why. But as soon as he was taken away, he wasn't -- he ate. He did what living things do, which is try to stay alive, and that fundamental point changes things.
>
> The other main bit of evidence that you can't ignore is the tape. And Dr. Benton refers to it in his letter. "Jaime Day's self-made videotape stands as a window into her emotional abuse of [G.H.] and likely reflects her best public persona." It was -- it was awful. And the courtroom couldn't watch it, the jurors, staff, us, and, yet, it was a tape that the defendant made that lasted 25 minutes. And I accept that as a window into what she was doing.
>
> So it's not a maximum case only from the standpoint that she's not -- I can't conceive of these set of circumstances being present in the future to result in the same sort of cruelty. Cruelty seems like a mild term for what we witnessed in trial, but I'm sentencing the defendant to 30 years at hard labor.

20

Defendant filed a timely motion to reconsider sentence.[3] The motion was denied without conducting a hearing.

Defendant asserts the trial court failed to comply with La.Code Crim.P. art. 894.1. She also asserts the sentence imposed was excessive and notes the trial court did not believe she was a threat and believed she was thrust into a situation she could not handle. In support of her claim of excessiveness, she asserts the trial court failed to consider that 1) she had no prior criminal record; 2) she had been a loving and caring mother to her three biological children; 3) she had no history of violence; 4) she had strong support from her family and church and had been a daily churchgoer for a majority of her life; 5) she and her husband won custody of G.H. after he suffered abuse and neglect at the hands of his biological mother; 6) many letters of support were submitted on her behalf; 7) she was a young adult and a candidate for rehabilitation; 8) she voluntarily sought the assistance of mental health professionals for G.H., inviting them into her home on a weekly basis for assessments and counseling; 9) the sentence presumed that many of G.H.'s problems were caused by Defendant, but the evidence shows G.H.'s problems were caused by his biological mother, which resulted in posttraumatic stress disorder, his pre-existing mental illness and destructive behavior, and Medicaid's refusal to authorize long-term inpatient care; and 10) she was the only person willing to stick with G.H., and it was unfair to punish her for all of his problems.

Whether the trial court failed to comply with La.Code Crim.P. art. 894.1 is an issue that may not be raised for the first time on appeal. *State v. Blue*, 09-1111 (La.App. 3 Cir. 4/7/10), 34 So.3d 447; *State v. Hebert*, 08-542 (La.App. 3 Cir.

---

[3]The State asserts that the motion to reconsider sentence may not have been a valid motion because it was filed after the motion for appeal had been granted, which divested the trial court of jurisdiction. By virtue of La.Code Crim.P. art. 916, the trial court retains jurisdiction to take action on properly filed motions to reconsider sentence after an order of appeal has been entered. Thus, Defendant's motion was timely filed.

11/5/08), 996 So.2d 688. Defense counsel made no objection to the trial court's failure to comply with the article at the sentencing hearing and did not mention it in his motion to reconsider sentence. Thus, we do not address this issue now.

We now turn to a review of the sentence for excessiveness. We explained in *State v. Soileau*, 13-770, 13-771, p. __ (La.App. 3 Cir. 2/12/14), __ So.3d __, __:

> Sentences within the statutory sentencing range can be reviewed for constitutional excessiveness. *State v. Sepulvado*, 367 So.2d 762 (La.1979). In *State v. Barling*, 00-1241, 00-1591, p. 12 (La.App. 3 Cir. 1/31/01), 779 So.2d 1035, 1042-43, *writ denied*, 01-838 (La.2/1/02), 808 So.2d 331, a panel of this court discussed the review of excessive sentence claims, stating:
>
> > La. Const. art. I, § 20 guarantees that, "[n]o law shall subject any person to cruel or unusual punishment." To constitute an excessive sentence, the reviewing court must find the penalty so grossly disproportionate to the severity of the crime as to shock our sense of justice or that the sentence makes no measurable contribution to acceptable penal goals and is, therefore, nothing more than a needless imposition of pain and suffering. *State v. Campbell*, 404 So.2d 1205 (La.1981). The trial court has wide discretion in the imposition of sentence within the statutory limits and such sentence shall not be set aside as excessive absent a manifest abuse of discretion. *State v. Etienne*, 99-192 (La.App. 3 Cir. 10/13/99); 746 So.2d 124, *writ denied*, 00-0165 (La.6/30/00); 765 So.2d 1067. The relevant question is whether the trial court abused its broad sentencing discretion, not whether another sentence might have been more appropriate. *State v. Cook*, 95-2784 (La.5/31/96); 674 So.2d 957, *cert. denied*, 519 U.S. 1043, 117 S.Ct. 615, 136 L.Ed.2d 539 (1996).
>
> Further, in reviewing the defendant's sentences, the appellate court should consider the nature of the crime, the nature and background of the offender, and the sentences imposed for similar crimes. *State v. Lisotta*, 98-648 (La.App. 5 Cir. 12/16/98), 726 So.2d 57 (citing *State v. Telsee*, 425 So.2d 1251 (La.1983)), *writ denied*, 99-433 (La.6/25/99), 745 So.2d 1183. In *State v. Smith*, 02-719, p. 4 (La.App. 3 Cir. 2/12/03), 846 So.2d 786, 789, *writ denied*, 03-562 (La.5/30/03), 845 So.2d 1061, a panel of this court observed that:
>
> > While a comparison of sentences imposed for similar crimes may provide some insight, "it is well settled that sentences must be individualized to the particular offender and to the particular offense committed." *State v. Batiste*, 594 So.2d 1 (La.App. 1 Cir.1991).

> Additionally, it is within the purview of the trial court to particularize the sentence because the trial judge "remains in the best position to assess the aggravating and mitigating circumstances presented by each case."
> *State v. Cook*, 95-2784 (La.5/31/96); 674 So.2d 957, 958.

The record establishes Defendant's guilt, and she does not now challenge the sufficiency of the evidence. However, a review of the testimony, which we summarize below, establishes the excessiveness of the sentence imposed.

### Testimony of G.H.'s teacher and school counselors

Christine Collins, Polly Fontenot, and Shelia Devillier each encountered G.H. at school. Each testified that, when they first observed G.H., he appeared very thin and had a black eye. Each of these witnesses testified that G.H. attributed his black eye to a fall off his father's bicycle. One witness testified she did not recognize G.H. from the year before because he was so much thinner. She obtained extra food for him from the cafeteria, which he readily ate. Two witnesses testified that Defendant frequently called or sent notes to the school instructing that G.H. was not to have any food other than what she packed for him. However, one witness testified that Defendant had explained that G.H. was not to have food from the cafeteria because he chose to pack his lunch, and she did not wish to pay for both. Nonetheless, she observed G.H. ask the other children for their uneaten food, and G.H. only had an apple in his lunchbox on one occasion. Two of these witnesses testified to an occasion where G.H. defecated in his pants at school.

### Sheila Vincent's testimony

Sheila Vincent is a homebound teacher who came into Defendant's home to instruct G.H. on four separate occasions. She testified that on three of her visits, G.H. silently refused to cooperate in the lessons. Instead, he stood at the corner of the table, put his head down, and did not interact with her. On one occasion, she

23

offered G.H. candy, with Defendant's knowledge, and G.H. did not eat the candy. She testified that she documented her final encounter with G.H. as "I now feel maybe my first impression of parental abuse was incorrect . . . I think there is something very disturbing about him and his surroundings." When asked to elaborate on these observations, she testified "Well, the fact that [G.H.] just stood where he stood . . . that he never communicated with me was very disturbing to me."

**Karla Simien's testimony**

Karla Simien, G.H.'s first foster mother, who had raised over sixty foster children over many years and adopted several of them, testified that, throughout the time that G.H. resided with her, she kept a journal, in which she documented G.H.'s behavior. She testified that G.H. would eat all through the day and hide food. Mrs. Simien testified that there were several occasions where G.H. harmed himself and threatened to blame the injuries on her and her husband. She described that G.H. would frequently go into the other foster children's rooms at night and stand directly over them, which scared them. He would also throw things at the other children while they slept. When he was disciplined over this odd behavior, he started throwing a tantrum, during which he screamed, clawed his face, and bit himself. He later told Mrs. Simien that he was going to blame the injuries on her husband.

She described another time that she told G.H. he could not have unlimited access to food, after which he threw a tantrum that lasted for hours, during which he would scream, growl, claw and bite himself, and throw furniture. After the tantrum, she documented in her journal that G.H. threatened to "do to [her] what he did to Jaime" and to tell others that she starved him. She testified that G.H. said he threatened her because he wanted to go to a place where he would get more

24

attention, because Defendant had not given him enough attention and the other foster children were getting more attention than he was. She finally requested his removal from the home.

## Susan Sportsman's testimony

Susan Sportsman was another of G.H.'s foster mothers. She testified that G.H. had a tendency to hoard food, to hide it in unusual places, and to throw tantrums if he was not allowed to have unrestricted access to food. She testified that the tantrums persisted for several years after he came to live with her, and, although they got better, the behavior never completely resolved. She testified that he would sometimes eat so much, he vomited. She testified that G.H. once threatened to kill her and himself. He physically attacked her several times; once was during a tantrum over food. She testified that G.H. had a problem with shoplifting and that he often did not obey when first told not to do something.

## Gerald Price's testimony

Defendant's father, Gerald Price, testified that he had observed G.H. refuse to eat on multiple different occasions. He testified that he observed G.H. urinate in the back seat of Mr. Price's vehicle. He testified that G.H. often refused to eat, demanded specific foods, and threw tantrums to avoid eating. He described a time where G.H. was making noise in the middle of the night. When he inquired into what G.H. had been doing, G.H. told him "nothing." Upon investigation, he discovered that G.H. had used a paint marker on multiple items of furniture and the floor. He remarked that he found "phenomenal" G.H.'s ability to be so sincere. When Mr. Price later tried to discuss the incident with G.H., G.H. told him, "I don't remember that. I only remember good things." He was so disturbed by G.H.'s "demeanor" that he recommended to Defendant that she obtain professional help for G.H.

### Laurie Labove's testimony

Laurie Labove is a licensed clinical therapist who also lived next door to Defendant while G.H. was in her care. She testified that she visited Defendant's home several times a week and that her grandson, who resides with her, played with Defendant's biological sons. She testified that Defendant was an excellent mother and encouraged G.H. to play with the children, but that G.H. "was always by [Defendant's] side" and that he "adored" Defendant. She described an incident where she observed G.H. urinate on himself. She described another incident where G.H. defecated on the living room floor. When Defendant asked why G.H. had done so, he responded "[b]ecause you're sitting there talking to her and not me." Finally, she testified that there were many occasions where Defendant prepared meals for all of the children, and G.H. would refuse to eat what was prepared. Instead, he would demand other items of food. Sometimes, after Defendant had prepared a special food item for G.H., he would refuse it, as well.

### Dr. Murphy's testimony

While he lived with Defendant, G.H. was hospitalized on three separate occasions, during which he was under the care of Dr. Charles Murphy, a psychiatrist qualified as an expert. Dr. Murphy described G.H. as "extremely articulate and sophisticated beyond his age," "very oppositional," and "attention-seeking and manipulative." He gave the following examples of G.H.'s manipulative behavior: G.H. often said he was going to harm himself "so that people will feel sorry for [him]," G.H. threatened to kill himself if he was discharged "in a very calm, cool and collected fashion," and G.H. complained that voices told him to harm himself, but that this was "very suspect . . . [because] his non-verbal communication . . . was inconsistent with what he was verbalizing."

He had several working diagnoses of G.H., but his final diagnosis was posttraumatic stress disorder longstanding.

G.H. reported to a member of the treatment team that he was "a changed person but may still lie and steal a little…'because nobody is perfect. Everybody does it.'" Dr. Murphy recorded that G.H. "love[d] father but love[d] stepmother more." Dr. Murphy testified that G.H. urinated and defecated in various places, including on himself, and that G.H. admitted he did so because he was angry at being punished, which Dr. Murphy found unusual. Finally, Dr. Murphy testified that, although it was possible that Defendant abused G.H., he believed that G.H.'s posttraumatic stress disorder longstanding was caused by the abuse he sustained while living with his biological mother. He testified that Defendant was working with the treatment team for G.H.'s benefit and that he was "very surprised" to see G.H. in the condition in which he arrived at the hospital on February 19, 2010.

### Dr. McCanless' testimony

Dr. Edgar McCanless, a pediatrician, examined G.H. multiple times after his February 19, 2010 hospital admission. G.H. weighed thirty-eight pounds, which was below the fifth percentile on a growth chart for children. Dr. McCanless testified that G.H. had obvious signs of physical abuse and malnourishment, including a black eye, a bruise to the left upper lip, a scar from a laceration on his upper lip, blisters inside his left ear, a small scab above the buttocks crease, a large burn scar on his back, a distended abdomen, edema of the legs and lower body parts, which was caused by low serum proteins in the blood as a result of starvation, anemia, low body temperature, and a fine coating of hair on his face, called lanugo, which was a result of starvation. Dr. McCanless testified that G.H. was later diagnosed with depression and posttraumatic stress disorder. Finally, Dr.

27

McCanless testified that he had never seen a child near G.H.'s age intentionally starve himself or sustain such self-inflicted injuries.

**Dr. Benton's testimony**

Dr. Scott Benton, an expert pediatrician for the state who specializes in child abuse pediatrics, testified that a "classic" symptom of starvation abuse is later food hoarding and that in each of the starvation abuse cases he had experienced, the children later hid food in unusual places and had arguments with their caretakers over food. He testified that he had never seen a child in G.H.'s age group self-starve, explaining that this behavior was usually observed in teenagers who were purposefully trying to lose weight. He found significant that, in each setting where G.H.'s access to food was not restricted, he ate. Regarding G.H.'s allegations that he ate his own feces and drank his own urine, Dr. Benton testified that eating feces or drinking urine is "typical of a starved child." He testified that G.H.'s later tendencies to hide food, to check for food in the home, and to disagree with throwing away leftovers were behaviors consistent with that of a starved child. He testified that he did not feel that G.H.'s injuries, which he were documented in the medical records and photographed, were self-inflicted, explaining that the "severity" of the injuries exceeded the typically superficial nature of most self-inflicted injuries.

**Lin McDonald's testimony**

Prior to his removal from her home, Defendant voluntarily sought assistance for G.H., enrolling him in an outpatient psychiatric treatment program called Helping Hands. Lin McDonald and other Helping Hand's staff came into the home once or twice per week to treat G.H., for a total of approximately forty sessions. Mr. McDonald testified that Defendant had reported that G.H. would not eat food she prepared and instead requested grits, but that when she prepared grits,

he also refused to eat them. He testified that he and his staff documented at least two occasions where G.H. stated he did not want to go to school and threatened to defecate on himself if forced to go. Finally, he testified that neither he nor his staff saw any evidence of child abuse.

**Discussion**

The evidence indicates that Defendant physically abused and starved G.H., and the sufficiency of the evidence is not now on appeal. However, after a thorough review of the record, we find that the thirty-year sentence "shocks the conscience" and is, therefore, excessive. The record reveals neither the degree to which Defendant intentionally harmed G.H. nor the degree to which the harm may be attributable to negligence in the context of caring for a difficult, mentally ill child. The record reveals a young man with significant mental illness prior to coming into Defendant's care. His behavior was difficult, at best, and often outrageous. We find the difficulties presented to Defendant in caring for G.H. significant in our review of the appropriateness of the sentence. It appears much of the harm to G.H. was unintentional, resulting in part from G.H.'s refusal to eat. Some of the bruising was likely caused by G.H. himself. The record overwhelmingly indicates that Defendant was in a precarious situation; she was caring alone for her own children and G.H., who was such a significant challenge, and was unable to get the assistance G.H. required. While we do not excuse her treatment of G.H., we must take into account the tremendous difficulty she faced in caring for him.

Moreover, we find significant that Defendant is a first time offender, with no prior history of violence, is not a threat to any other children, is a young woman with the capacity for rehabilitation, took good care of her biological children, and was involved with church throughout her life. We can find no measurable

29

contribution that such a harsh sentence would provide. For these reasons, we feel that the sentence of thirty years at hard labor is excessive. Accordingly, pursuant to La.Code Crim.P. art. 881.4(A), we remand this matter to the trial court for resentencing.

Although we could find no cases factually analogous to the instant case, we find a review of cases where a sentence of thirty years was imposed to be illuminating.

In *State v. Davis*, 39,197 (La.App. 2 Cir. 12/16/04), 890 So.2d 708, *writ denied*, 05-1346 (La. 1/9/06), 918 So.2d 1041, the defendant was living with E.N. and her four-year-old son, A.N., when he beat A.N. for being unable to count properly. A physician testified that A.N. was bruised on his back from his shoulders to his knees; several areas of skin had been torn from his back side and buttocks, which were due in part to human bites; his body was severely swollen from the accumulation of blood under the skin; he appeared to be twice his normal size; his kidneys had failed; he had a terribly high chemical imbalance; and he had severe muscle damage. The physician stated A.N. was in intensive care for over a week.

The defendant had a prior conviction for attempting to disarm a police officer. He pled guilty to second degree cruelty to juveniles, and the state agreed not to charge the defendant as a second felony offender. The defendant was sentenced to thirty years at hard labor, which was upheld on appeal.

In *State v. Dixon*, 03-160 (La.App. 3 Cir. 6/4/03), 852 So.2d 471, the victim testified that the defendant, his step-father, whipped him with an extension cord on his buttocks, legs, back, and neck, causing bleeding. The defendant also hit the victim with a walking cane and his fists or hands. He held the victim by his ankles and dropped him to the floor. The victim sustained a hematoma on the forehead; a

30

laceration on the upper lip; swelling to the upper and lower lips; multiple semi-circular lesions on the neck in the form of an inverted "c," which would be consistent with being struck by an extension cord; bruises over his entire back and chest; bruising on the inner and outer thighs, buttock, and legs; swollen knees, which caused diminished ability to bend them. Several of the wounds were large and open down to the bare muscle tissue and the victim he could hardly walk due to the pain caused by the open wounds. A doctor testified that the victim suffered severe physical abuse over a period of time.

The defendant was convicted of second degree cruelty to a juvenile and sentenced to thirty years at hard labor. The defendant had a prior felony conviction for manslaughter, and prior to sentencing, the state withdrew its motion to have the defendant sentenced as a habitual offender. This court found the defendant's sentence was not excessive.

Although the excessiveness of the imposed sentence was not an issue on appeal, we also find *State v. Vance*, 03-1946 (La.App. 4 Cir. 6/30/04), 879 So.2d 862, *writ denied*, 06-1071 (La. 11/9/06), 941 So.2d 34, provides some guidance to the trial court in resentencing Defendant. In *Vance*, the defendant was the father of the victim, a one year old boy. The child was brought to the emergency room with second-degree burns to his head, face, feet, ankles, and backside. The defendant testified that the burns occurred after he took a bath with the child and the child stayed in the bathtub too long. A physician expert testified that the pattern of injuries suggested the child was dipped into hot water and were not likely to occur when an adult bathed with a child.

The defendant was convicted of second degree cruelty to a juvenile, adjudicated a second habitual offender, and sentenced to serve twenty years at hard

labor. We note the evidence did not reveal whether the child's injuries were intentionally or negligently inflicted.

Defendant received the same sentence as the defendants in *Davis*, 890 So.2d 708, and *Dixon*, 852 So.2d 471. We note the strong contrast between the defendants in those cases and Defendant in the instant matter. In *Davis*, 890 So.2d 708, and *Dixon*, 852 So.2d 471, the defendants intentionally injured and traumatized children, and there was no evidence that the children had any pre-existing psychological issues that made them especially difficult to care for to mitigate the abuse. Further, they were second offenders with little candidacy for successful rehabilitation. We also note, in *Vance*, 879 So.2d 862, the defendant received a sentence of twenty years where the evidence did not reveal whether he had intentionally or negligently injured the child, but he was also a second offender, and likely had little chance of rehabilitation.

In the instant matter, Defendant is a young woman, who attended church throughout her life, took good care of her biological children, and had no history of crime or violence. Thus, she is likely a good candidate for rehabilitation. Further, she was faced with a tremendously difficult situation in caring for G.H., a young man whose serious problems existed prior to coming into Defendant's care. It is likely that G.H.'s injuries were self-inflicted to some measure, and some were the result of Defendant's negligence in this very difficult situation.

## CONCLUSION

Based on the foregoing, Defendant's conviction is affirmed. However, we vacate her sentence and remand to the trial court for resentencing.

**CONVICTION AFFIRMED. SENTENCE VACATED. REMANDED FOR RESENTENCING.**

32