I THIBODEAUX, Judge.
The Defendant, Joseph Michael Dixon, appeals his conviction of second degree cruelty to juveniles, La.R.S. 14:93.2.3, and his sentence of thirty years at hard labor. He asserts that the sentence imposed was excessive in comparison to the nine year sentence imposed on the co-defendant, the mother of the juvenile. Additionally, he maintains that the trial court erred in determining the competency of the child witness, and the sufficiency of the evidence.
For the following reasons, we affirm.

LAW AND DISCUSSION

Sufficiency of the Evidence
Louisiana Revised Statutes 14:93.2.3 provides in pertinent part:
A. (1) Second degree cruelty to juveniles is the intentional or criminally negligent mistreatment or neglect by anyone over the age of seventeen to any child under the age of seventeen which causes serious bodily injury or neurological impairment to that child.
(2) For purposes of this Section, “serious bodily injury” means bodily injury-involving protracted and obvious disfigurement or protracted loss or impairment of the function of a bodily member, organ, or mental faculty, or substantial risk of death.
At trial, the victim, J.E.,[1] testified. The victim stated that he was seven years old and lived in South Carolina with his mom and dad, Tonya and Michael Ballard. The victim testified that he used to live in Marksville with his “real mama,” O. E., and his “step daddy,” Joseph Michael Dixon. When asked if Joseph Michael Dixon was in the courtroom, the victim pointed to the Defendant. According to the victim, he lived in the same house with the Defendant between January and March 1?2002. While living in the same house, the Defendant whipped the victim with an extension cord on the victim’s buttocks, legs, back, and neck. The Defendant made the victim take off his pants and whipped the victim underneath his clothing. When asked how many times this occurred, the victim replied, “[tjwice.” According to the victim, he bled when he was hit with the extension cord.
The victim further testified that the Defendant hit him in the ankle with a walking cane. When asked if the Defendant ever hit him with his fist or his hand, the victim stated that the Defendant hit him with a fist in his stomach and back. When the Defendant hit him in the stomach, the victim’s breath was knocked out of him. The Defendant also held the victim up by his ankles and dropped him to the floor, causing the victim’s stomach and lip to hit the floor. When asked if he bled or got a “busted lip,” the victim replied, ‘Tes, ma'am.” ■
The State asked the victim if he started to bleed or “anything” when he was hit with the walking cane or extension cord. The victim replied, “No, ma‘am. The extension cord.” When the State asked the victim to tell about the extension cord, the victim replied, “When he had hit me it *473 started bleeding.” According to the victim, the bleeding occurred only once, and pictures were taken of his wounds. The victim identified S B as a picture of his legs. The picture shows the victim’s legs with red marks, bruising, and opened wounds. We note that one of the wounds in the photograph looks as though it was bleeding. When asked how “it” felt, the victim replied, “Bad.” The victim also stated that the injuries lasted for more than one month and were present even after he moved to South Carolina.
Next, the victim identified a photograph which showed bruising and what appeared to be (although it is hard to tell) wounds or abrasions on the victim’s buttocks. (State’s Exh. 4). When asked if “this” happened just once or over several | ¡¡times, the victim replied, “Several times.” He also testified that Michael Dixon, the Defendant, did “this” to him with an extension cord.
State’s Exhibit 5 was identified by the victim as a picture of his knees, which appeared to be bruised and swollen. When the State asked the victim what happened to his knees,' the victim answered, “He hit me with his cane on my knee.” The victim testified that it hurt, his knees were swollen, and his walking was affected for one day. State’s Exhibit 6, the victim testified, was a photograph of his neck. According to the victim, “He hit me with the extension cord on my neck.”
Finally, the victim identified S-7 as a photograph of the back of his leg showing wounds and a bandaged area. The victim testified that there was a big sore on his leg that had a bandage on it. When asked how he received the big sore, the victim replied, “He had whipped me with an extension cord.”
The State asked the victim to show the jury where he still had a scar. The court noted that the victim was pointing to his right rear leg just above the knee. The victim also showed the jury other scars on his back that he stated were caused by Michael Dixon hitting him with an extension cord. When asked if he had scars anywhere else, the victim pointed to his behind and stated that his scars were caused by Joseph Michael Dixon hitting him with an extension cord. According to the victim, no one else put scars on him.
On cross, the victim remembered talking with Detective Herbert Guillot of the Marksville Police Department. When asked if he remembered telling Detective Guillot that someone else, besides Michael Dixon, hit him with an extension cord, the victim replied “Yes, sir,” and named his “mama.” According to the victim, his mother hit him one time, but at a different time than Michael Dixon hit him. The victim also stated that his mother made him take his clothes off. When asked if he 14remembered talking with Detective Guil-lot about his aunt and some movies, the victim replied that he did, however, he did not remember whether or not being hit with the extension cord had anything to do with his aunt or the movies. Defense counsel asked the victim if being hit with the extension cord had anything to do with someone showing him something nasty, and the victim replied, “No, sir-.” Although at trial, the victim denied having a cousin that “did something” to him, he remembered previously saying that he did.
When asked on re-direct whether the Defendant ever told him to say something else happened to him, the victim responded, “That was my mama ... [tjhat’s what my mama say.” The victim also testified that his mother did not make him bleed when she hit him with the extension cord, but Michael Dixon did.
Shawn Davis, a Child Protection Investigator, testified that the victim was seven *474 years old while the Defendant was age thirty-eight. She also testified that the Defendant was the victim’s stepfather. Ms. Davis saw the victim’s injuries on March 1, 2002, and identified the photographs introduced as fair representations of the victim’s injuries at that time. According to Ms. Davis, the Emergency Room at Avoyelles Hospital reported this incident.
On cross, defense counsel asked Ms. Davis if she questioned the Defendant as to why he whipped the victim. Ms. Davis stated that she did ask the Defendant and “[he] stated that the child was bad and, you know, he just was bad, you know, a bad child. And that was his method of disciplining him.”
Dr. L.J. Mayeux, the coroner of Avo-yelles Parish, testified as an expert in the field of Family Practice. Dr. Mayeux initially examined the victim on March 5, 2002. Dr. Mayeux described the victim as very intelligent and very friendly. Dr. Mayeux summarized his visit with the victim and his findings as follows:
|r[J.E.] was brought in under the supervision of Ms. Shawn Davis who works for Child Protection. He was brought in the office at eleven forty-five a.m. History was that he had been brought to the emergency room the Friday prior. His mother, Mrs. [O.E.] and her boyfriend, who is stated as Joseph Michael Dixon, alleged that he had fallen while trying to get onto a school bus hurting his knee. The emergency room physician was somewhat suspicious of child abuse and it called in Child Protection Agency. The question with [J.E.], again, [J.E.] was a very friendly young man, very intelligent. He stated to me that he had been severely abused for several months. That most of his whippings had been with either a belt or an extension cord.
[[Image here]]
In further questioning the child, again, which is part of the examination and the conclusions drawn he states that not only he had been whipped, he had dropped and thrown on his face several times. In cross questioning, re-questioning [J.E.] he was very consistent with his stories. Physical findings of [J.E.]: Starting to be a well developed young male. Weighed seventy-four pounds. He had a hematoma or a swelling on his forehead that measured one inch by one inch. He also had a laceration or a cut of the upper lip. Both the upper and lower lips were markedly swollen. He stated to me this had occurred on Thursday when he was thrown to the floor. Patient also had multiple semi-circular lesions in [sic] the neck. These were basically in the form of an inverted “c”. Which would be consistent with some type of looped instrument. He also had bruises over the entire back and chest consistent with a limb object. From the waist down, this is basically from his belt line down he was completely bruised on the inner and outer thighs, buttock, and legs. This is ... this was in the front, the back, inside the legs, and outside the legs. There were several of these wounds that were large and opened. Meaning they were literally ... there was no skin left. It was down to the bare muscle tissue. The child could hardly ... when he walked in he could barely walk due to the pain caused by the opened wounds. Both of his knees were markedly swollen. The right knee was approximately fifty percent enlarged secondary to swelling. The left knee was approximately thirty percent swollen. Range of motion or the ability to bend the knees was grossly diminished. In fact, he could hardly walk. He stated ... when *475 I asked him what had happened to his knees he states that on Thursday night he had been hit with a black and brown walking cane across both knees for absolutely no reason. Impression at this time was severe | ^physical abuse over a period of time and the time frame came that in examining this young man you could see wounds of all ages. You had fresh wounds, you had bruises that were old, you had active wounds that were basically infected, you had the knees that were swollen. So you had wounds of all age as far as there [sic] time frame. So all these wounds had not occurred in one time frame. The patient was scheduled for an abdominal ultra sound which is a special x-ray to determine any intra abdominal pathology. He was also started on Batroban (s/p) which is an antibiodic [sic] cream to be applied to the opened wounds. He was also asked to be returned to my office for a follow up through the office of Child Protection. These office visits were kept and [J.E.] was seen by me on approximately four additional visits. The last visit being an exit visit of April 18th at which time the scarring was still present although there was no signs of infection and there was no new trauma since he had been placed in Foster Care.
Dr. Mayeux opined that the extension cord introduced as State’s Exhibit 1 was consistent with the semi-circular lesions left on the victim, and the marks on the victim’s knees were consistent with the victim being struck with a cane. When asked if the injuries to the victim were serious, Dr. Mayeux responded:
Yes, ma'am. Very serious. One the inner themselves were serious. The time frame was also concerning and the potential for internal organ injury was also very severe. Had this child not sought and had medical treatment the chance of having ... Had these injuries
of the buttock and the legs gotten secondary infection, infected, those could have potentially been life threatening and since I can’t introduce the record I’d like to read my last paragraph if I may just to show you the severity.
Dr. Mayeux then read the following conclusion from his report:
In summary this child has been physically abused over a period of time. The bruises show aging from several months to very recent. In twenty-nine years of medical training and private practice this is one of the worse abuse cases I’ve seen except for a child being killed. The recommendations start with x-rays, ultrasound, the Batroban (s/p), and this he be placed in ... kept in Foster Care from protection of the individual.
j7When asked if he considered the victim’s injuries as protracted, Dr. Mayeux responded, “Yes, ma'am.” Dr. Mayeux defined protracted as “over a course of time.” Dr. Mayeux further opined that the injuries to the victim caused permanent disfigurement. Later in his testimony, Dr. Mayeux reiterated that the victim could hardly walk when he saw the doctor. Although Dr. Mayeux stated that the photographs introduced into evidence depicted the way the victim looked when he came to his office, Dr. Mayeux indicated that the injuries looked worse when he saw them in person. The doctor explained:
Ms. Roy, I’ll be honest with you. I saw him as I stated the examination started at 11:45 and for the first time in a long time I was basically unable to do anything the rest of the day. It was horrifying to see this young man in person. ... Again, still photography does this no justice. Just the number, the (UNINTELLIGIBLE) and the severity was just beyond imagination.
Finally, Dr. Mayeux testified that the victim’s injuries were not consistent with the *476 victim falling off of the school bus or with a five-year-old cousin hitting him with a switch.
On cross, Dr. Mayeux testified that the victim had no internal injuries, no broken bones, and no sutures. Dr. Mayeux explained that the wounds could not be sewn because they were opened, and the skin had been removed. When defense counsel asked Dr. Mayeux how long it took for the injuries to heal, the following colloquy ensued:
A: Mr. McKay, a child heals so much faster than an adult. We had some injuries that were probably four to six weeks in length because once you get to a certain point of maceration especially in dark skinned people you have hydro pigmentation which changes the pattern, but you had injuries anywhere from four to six weeks of age and as fresh as several days.
Q: When you saw him last on April 18th, 2002, were the wounds essentially healed?
|SA: They were scarred.
Q: Scarred.
A: So scarring is a form of healing, but it’s still not a normal skin appearance.
Q: Okay. I understand. As far as being opened wounds and bruises they had pretty much gone away at that point, is that true?
A: Correct.
The record contains sufficient evidence that the Defendant intentionally mistreated the minor victim pursuant to La.R.S. 14:93.2.3. The victim identified the Defendant in court as his “step-daddy,” Joseph Michael Dixon. In much of the victim’s testimony, the victim referred to the perpetrator as “he” without naming the Defendant specifically. At the beginning of his testimony, however, the victim specifically named the Defendant as his stepfather and specifically named the Defendant as the perpetrator in portions of his testimony. Since no other male figure had been named as a possible perpetrator (the victim’s mother had been named also), the Defendant was sufficiently identified as a perpetrator.
The Defendant claims that the State merely established that he spanked the victim, “but did not exclude the probability that the mother of the child imposed the injuries.” He also adds, “[t]o the extent that the child’s testimony provided a basis for a determination of that issue, the trial court’s failure to specifically determine the child’s competency is a fatal error in this record.” However, to the extent that the Defendant is arguing that the evidence was insufficient to prove he, rather than the mother, caused the injuries to the victim, the claim lacks merit. The victim’s testimony, even if found to be inadmissible, must be considered in reviewing the sufficiency of the evidence. State v. Hearold, 603 So.2d 731 (La.1992). Even if the victim’s mother whipped the victim and caused some injuries, the evidence and the ^testimony of the minor child and Dr. Mayeux were sufficient to prove that the Defendant caused the injuries specifically noted by Dr. Mayeux.
Considering the above, we find that the evidence was sufficient to prove the Defendant intentionally mistreated the victim and caused injuries. Although the Defendant told Ms. Davis, the Child Protection Investigator, that he was disciplining the child, the Defendant does not raise that defense on appeal. The Defendant’s actions, even if considered discipline, did not constitute reasonable discipline. See La. R.S. 14:18(4).
The final issue to be resolved is whether the State proved the Defendant caused serious bodily injury. Louisiana Revised Statutes 14:93.2.3 defines serious bodily injury as “bodily injury involving protracted and obvious disfigurement or protracted loss or impairment of the function *477 of a bodily member, organ, or mental faculty, or substantial risk of death.” Because La.R.S. 14:93.2.8 was recently enacted (in 1999), defense counsel suggests that this court look to the definition of serious bodily injury set forth in second degree battery, La.R.S. 14:34.1, and the jurisprudence interpreting that definition. Defense counsel suggests that La.R.S. 14:93.2.3 contemplates permanent injury.
Neither second degree battery nor second degree cruelty to a juvenile defines protracted as a permanent or lifetime condition as proposed by the Defendant. Webster’s Ninth New Collegiate Dictionary defines protract as “to draw forward,” “to delay, defer,” “to prolong in time or space: continue.” Thus, there is no requirement that the injuries inflicted upon the victim must be permanent, lifelong, or chronic as suggested by the Defendant.
The record in the present case supports a conclusion that the victim suffered protracted impairment of a bodily function as well as obvious disfigurement 11t1and possibly a substantial risk of death. Dr. May-eux testified that when he saw the victim, the victim was completely bruised from the waist down, on his inner and outer thighs, buttocks, and legs. Several of the wounds were large and opened, with literally no skin left. The victim could barely walk because of the. pain from the opened wounds. Both knees were swollen, with the right knee being approximately fifty percent enlarged. The victim’s ability to bend his knees was “grossly diminished,” and he could hardly walk. Dr. Mayeux saw fresh wounds as well as old wounds on the victim. Some of the wounds were infected, and, if secondary infection had set in, the wounds could have been life-threatening. Additionally, the record reflects that at trial, seven months after the victim’s initial visit with Dr. Mayeux, the victim showed the jury scars that were still present on his body. Finally, Dr. Mayeux described the victim’s physical condition as one of the worst cases of abuse he had seen. Dr. Mayeux stated that it was horrifying to see the victim in person and, after seeing the victim, he was unable to do much the rest of the day. Considering Dr. Mayeux’s testimony, we find that the jury did not err in finding the Defendant inflicted serious bodily injury upon the victim.
For the foregoing reasons, the evidence was sufficient to support the jury’s verdict of second degree cruelty to a juvenile.
Excessiveness of Sentence
The Defendant claims he received an excessive thirty-year sentence while the victim’s mother, who pled guilty to second degree cruelty to a juvenile, received only a nine-year sentence. For the offense of second degree cruelty to a juvenile, the Defendant could have been sentenced at hard labor for not more than forty years. As stated, the trial court sentenced the Defendant to thirty years at hard labor to run consecutive to any other sentence previously imposed. Since the offense Inis a crime of violence, the trial court also stated that the sentence would not be subject to diminution for good behavior. .
Prior to sentencing, the State withdrew its motion to have the Defendant sentenced as a habitual offender. The trial court noted that in preparing for sentencing, it had reviewed the entire record of the proceeding, the Pre Sentence Investigation Report, correspondence sent by the mother of the victim as well as the applicable law and jurisprudence.
The Pre Sentence Investigation Report (PSI) confirms that the Defendant was previously arrested for second degree murder and pled guilty to manslaughter. The Defendant was also arrested on two counts of aggravated assault but found not guilty. Subsequently, the Defendant was charged with aggravated battery and pled guilty to simple battery. According to the *478 P.S.I., the Defendant is a second felony-offender. As noted earlier, the State withdrew its motion to have the Defendant sentenced as a habitual offender.
The sentence imposed on the co-defendant has no bearing on the sentence imposed upon the Defendant. “[I]t is well settled that a sentence must be individualized as to each defendant.... State v. Williams, 677 So.2d 692 (La.App. 3 Cir.1996); State v. Lemelle, 502 So.2d 130 (La.App. 3 Cir.1987).” State v. Lofton, 97-00383 (La.App. 3 Cir. 10/8/97); 701 So.2d 712, 715, writ denied, 98-0389 (La.6/5/98); 720 So.2d 679. The disparity in a sentence imposed upon co-defendants “is only a factor to be considered along with all other appropriate considerations when there is no reasonable basis in the record for the disparity. State v. Sims, 410 So.2d 1082 (La.1982).” State v. Quimby, 419 So.2d 951, 962 (La.1982). Considering the Defendant’s violent criminal history and the dominant role he played in the victim’s I t «abuse, the trial court did not abuse its discretion in imposing a sentence upon the Defendant that is longer than the sentence imposed upon the victim’s mother.
Furthermore, the reasons given by the trial court and the record as a whole support the sentence imposed. As stated in State v. Cook, 95-2784, p. 3 (La.5/31/96); 674 So.2d 957, 959, cert. denied, 519 U.S. 1043, 117 S.Ct. 615, 136 L.Ed.2d 539 (1996), “The only relevant question on review ... [is] ‘whether the trial court abused its broad sentencing discretion, not whether another sentence might have been more appropriate.’ State v. Humphrey, 445 So.2d 1155, 1165 (La.1984) (citing State v. Williams, 412 So.2d 1327 (La.1982)).” Thus, the imposition of a thirty-year sentence was not an abuse of discretion.
Competency of the Child Witness
The Defendant claims the trial court erred in failing to determine the competency of the victim, a child witness, when the victim was unresponsive to questions regarding his ability to tell the difference between the truth and a lie. Although the trial court did not formally rule on the victim’s competency, the trial court nevertheless allowed him to testify. Defense counsel did not question the child further nor did he object to the child testifying. Thus, the Defendant has waived any objection to the trial court’s admission of the victim’s testimony and is precluded from assigning this error on appeal. La. Code Crim.P. art. 841. State v. Davis, 95-801 (La.App. 3 Cir. 12/6/95); 664 So.2d 821; State v. Dickerson, 01-1287 (La.App. 5 Cir. 6/26/02); 822 So.2d 849, writ denied, 02-2108 (La.2/21/03); 837 So.2d 627.

CONCLUSION

For the foregoing reasons, the Defendant’s conviction for second degree cruelty to juveniles and his sentence of thirty years at hard labor are affirmed.
AFFIRMED.

. Pursuant to La.R.S. 46:1844(W), the victim's initials will be used to protect his identity-