# STATE OF LOUISIANA
## COURT OF APPEAL, THIRD CIRCUIT

## 15-564

**STATE OF LOUISIANA**

**VERSUS**

**JAIME BROOKS DAY**

**********

APPEAL FROM THE
FOURTEENTH JUDICIAL DISTRICT COURT
PARISH OF CALCASIEU, NO. 15589-10
HONORABLE CLAYTON DAVIS, DISTRICT JUDGE

**********

## ULYSSES GENE THIBODEAUX
## CHIEF JUDGE

**********

Court composed of Ulysses Gene Thibodeaux, Chief Judge, James T. Genovese, and David Kent Savoie, Judges.

**AFFIRMED.**

John Foster DeRosier
District Attorney – 14th Judicial District
Karen C. McLellan
Assistant District Attorney – 14th Judicial District
Lori Theresa Lewis Nunn
Assistant District Attorney – 14th Judicial District
Carla Sue Sigler
Assistant District Attorney – 14th Judicial District
P. O. Box 3206
Lake Charles, LA 70602-3206
Telephone: (337) 437-3400
COUNSEL FOR:
    Plaintiff/Appellee - State of Louisiana

**William Todd Fontenot**
**Fontenot & Fontenot Law Firm**
**720 Kirby Street**
**Lake Charles, LA 70601**
**(337) 491-3864**
**COUNSEL FOR:**
  **Defendant/Appellant - Jaime Brooks Day**

**THIBODEAUX, Chief Judge.**

Jaime Brooks Day appeals as excessive the ten-year sentence imposed by the trial court on remand, for the crime of second degree cruelty to a juvenile, pursuant to La.R.S. 14.93.2.3. Concluding that the sentence imposed on remand was not excessive, we affirm the ten-year sentence.

## I.

## ISSUES

We must decide:

(1) whether the trial rejected this court's findings and imposed a prison sentence based upon contrary findings of its own; and

(2) whether the trial court imposed an excessive sentence by failing to properly apply the factors set forth in La.Code Crim.P. art. 894.1.

## II.

## FACTS AND PROCEDURAL HISTORY

The defendant, Jaime Brooks Day, was convicted of second degree cruelty to a juvenile, her step-son, G.H.[1] She was sentenced to thirty years at hard labor pursuant to La.R.S. 14.93.2.3. The statute allows for a maximum sentence of forty years at hard labor. In a previous appeal, *State v. Day*, 14-708 (La.App. 3 Cir. 12/23/14), 158 So.3d 120,[2] this court affirmed Day's conviction but vacated the sentence, finding it excessive and remanding the case to the trial court for resentencing consistent with the opinion.

---

[1]The victim's initials are used in accordance with La.R.S. 46:1844(W).

[2]The decision was rendered with one judge concurring and one judge dissenting.

On remand, the trial court sentenced the defendant to serve ten years at hard labor. A motion to reconsider the sentence was filed and denied. On appeal, Ms. Day asserts two assignments of error. She contends that the trial court committed legal error by rejecting this court's findings and imposing a ten-year prison sentence based upon contrary findings of its own. She further asserts that the trial court failed to properly apply the factors set forth in La.Code Crim.P. art. 894.1, resulting in an excessive sentence.

III.

**STANDARD OF REVIEW**

Sentences within the statutory sentencing range can be reviewed for constitutional excessiveness. *State v. Sepulvado*, 367 So.2d 762 (La.1979). In *State v. Barling*, 00-1241, 00-1591, p. 12 (La.App. 3 Cir. 1/31/01), 779 So.2d 1035, 1042-43, *writ denied*, 01-838 (La.2/1/02), 808 So.2d 331, a panel of this court discussed the review of excessive sentence claims, stating:

La. Const. art. I, § 20 guarantees that, "[n]o law shall subject any person to cruel or unusual punishment." To constitute an excessive sentence, the reviewing court must find the penalty so grossly disproportionate to the severity of the crime as to shock our sense of justice or that the sentence makes no measurable contribution to acceptable penal goals and is, therefore, nothing more than a needless imposition of pain and suffering. *State v. Campbell*, 404 So.2d 1205 (La.1981). The trial court has wide discretion in the imposition of sentence within the statutory limits and such sentence shall not be set aside as excessive absent a manifest abuse of discretion. *State v. Etienne*, 99-192 (La.App. 3 Cir. 10/13/99); 746 So.2d 124, *writ denied*, 00-0165 (La.6/30/00); 765 So.2d 1067. The relevant question is whether the trial court abused its broad sentencing discretion, not whether another sentence might have been more appropriate. *State v. Cook*, 95-2784 (La.5/31/96); 674 So.2d 957, *cert. denied*, 519 U.S. 1043, 117 S.Ct. 615, 136 L.Ed.2d 539 (1996).

Further, in reviewing the defendant's sentences, the appellate court should consider the nature of the crime, the nature and background of the offender, and the sentences imposed for similar

2

crimes. *State v. Lisotta*, 98-648 (La.App. 5 Cir. 12/16/98), 726 So.2d 57 (citing *State v. Telsee*, 425 So.2d 1251 (La.1983)), *writ denied*, 99-433 (La.6/25/99), 745 So.2d 1183. In *State v. Smith*, 02-719, p. 4 (La.App. 3 Cir. 2/12/03), 846 So.2d 786, 789, *writ denied*, 03-562 (La.5/30/03), 845 So.2d 1061, a panel of this court observed that:

> While a comparison of sentences imposed for similar crimes may provide some insight, "it is well settled that sentences must be individualized to the particular offender and to the particular offense committed." *State v. Batiste*, 594 So.2d 1 (La.App. 1 Cir.1991). Additionally, it is within the purview of the trial court to particularize the sentence because the trial judge "remains in the best position to assess the aggravating and mitigating circumstances presented by each case." *State v. Cook*, 95-2784 (La.5/31/96); 674 So.2d 957, 958.

*State v. Soileau*, 13-770, 13-771, pp. 4-5 (La.App. 3 Cir. 2/12/14), 153 So.3d 1002, 1005-06, *writ denied*, 14-452 (La. 9/26/14), 149 So.3d 261.


IV.

## LAW AND DISCUSSION

### *Excessiveness of Sentence*

Jaime Day contends that the ten-year sentence imposed by the trial court on remand was excessive and does not reflect this court's instructions. We disagree. It is undisputed that G.H. was in the care of Jaime Day. The pictures, testimony, and Day's own video indicate severe and hateful emotional cruelty by Jaime Day as well as criminal physical neglect by Jaime Day.

G.H.'s aunt, Katy Day, found him alone in the middle of a school day on February 19, 2010. He was thirty-eight pounds at age nine, cold, shivering, and starving, on the floor, in an otherwise empty room, except for a thin mattress and a Bible. While this court previously found that thirty years was excessive because all of the harm by Jaime Day may not have been intentional, the record reflects that the neglect was deliberate and cruel. And, there is overwhelming testimony that

G.H. did not self-starve or self-inflict the physical wounds with which he was found:  a large circular burn wound in the middle of his boney back with a total diameter of seven or eight inches; ligature marks on the fronts of both ankles; cuts on his head and inside his mouth and ear; bruises and scars on his eye, lips, stomach, arms, and legs; facial and body hair, called "lunago," indicating starvation.

The statute governing Jaime Day's conviction by the jury is La.R.S. 14.93.2.3, entitled "Second degree cruelty to juveniles."  It provides in pertinent part:

> A.  (1) Second degree cruelty to juveniles is the intentional or criminally negligent mistreatment or neglect by anyone over the age of seventeen to any child under the age of seventeen which causes serious bodily injury or neurological impairment to that child.
>
> (2) For purposes of this Section, "serious bodily injury" means bodily injury involving protracted and obvious disfigurement or protracted loss or impairment of the function of a bodily member, organ, or mental faculty, or substantial risk of death.
>
> . . . .
>
> C.  Whoever commits the crime of second degree cruelty to juveniles shall be imprisoned at hard labor for not more than forty years.

La.R.S. 14:93.2.3.

There are few cases interpreting the statute.  In Day's previous appeal, *Day*, 158 So.3d 120, the panel found that a thirty-year sentence was excessive where it appeared that some of the bruising may have been caused by G.H. himself.  The panel found it significant that Jaime Day was a first offender with no known history of violence and had the capacity for rehabilitation.  The panel distinguished three cases imposing sentences of twenty and thirty years for the

4

same crime, where the defendants had previous felonies, less hope for successful rehabilitation, and where there was no suggestion of any self-inflicted harm by the victims.[3] Subsequently, on remand, the trial court reduced Jaime Day's sentence from thirty years to ten years, only one third of the original sentence.

---

[3]In *Day*, 158 So.3d at 140-41, the court stated as follows:

Although we could find no cases factually analogous to the instant case, we find a review of cases where a sentence of thirty years was imposed to be illuminating.

In *State v. Davis*, 39,197 (La.App. 2 Cir. 12/16/04), 890 So.2d 708, *writ denied*, 05-1346 (La. 1/9/06), 918 So.2d 1041, the defendant was living with E.N. and her four-year-old son, A.N., when he beat A.N. for being unable to count properly. A physician testified that A.N. was bruised on his back from his shoulders to his knees; several areas of skin had been torn from his back side and buttocks, which were due in part to human bites; his body was severely swollen from the accumulation of blood under the skin; he appeared to be twice his normal size; his kidneys had failed; he had a terribly high chemical imbalance; and he had severe muscle damage. The physician stated A.N. was in intensive care for over a week.

The defendant had a prior conviction for attempting to disarm a police officer. He pled guilty to second degree cruelty to juveniles, and the state agreed not to charge the defendant as a second felony offender. The defendant was sentenced to thirty years at hard labor, which was upheld on appeal.

In *State v. Dixon*, 03-160 (La.App. 3 Cir. 6/4/03), 852 So.2d 471, the victim testified that the defendant, his step-father, whipped him with an extension cord on his buttocks, legs, back, and neck, causing bleeding. The defendant also hit the victim with a walking cane and his fists or hands. He held the victim, by his ankles and dropped him to the floor. The victim sustained a hematoma on the forehead; a laceration on the upper lip; swelling to the upper and lower lips; multiple semi-circular lesions on the neck in the form of an inverted "c," which would be consistent with being struck by an extension cord; bruises over his entire back and chest; bruising on the inner and outer thighs, buttock, and legs; swollen knees, which caused diminished ability to bend them. Several of the wounds were large and open down to the bare muscle tissue and the victim he could hardly walk due to the pain caused by the open wounds. A doctor testified that the victim suffered severe physical abuse over a period of time.

The defendant was convicted of second degree cruelty to a juvenile and sentenced to thirty years at hard labor. The defendant had a prior felony conviction for manslaughter, and prior to sentencing, the state withdrew its motion to have the defendant sentenced as a habitual offender. This court found the defendant's sentence was not excessive.

Although the excessiveness of the imposed sentence was not an issue on appeal, we also find *State v. Vance*, 03-1946 (La.App. 4 Cir. 6/30/04), 879 So.2d 862, *writ denied*, 06-1071 (La. 11/9/06), 941 So.2d 34, provides some guidance to the trial court in resentencing Defendant. In *Vance*, the defendant was the father of the victim, a one year old boy. The child was brought to the emergency room

Day argues that the trial court's sentence of ten years was not based upon the factual findings made by this court. Louisiana Constitution Article 5, § 10(B) provides that the criminal jurisdiction of a court of appeal extends "only to questions of law." An appellate court's authority to review findings of fact in criminal cases is limited to the sufficiency of the evidence evaluation under *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781 (1979), but the appellate court may impinge on the trier of fact's prerogative only to the extent necessary to guarantee constitutional due process. *State v. McKeever*, 407 So.2d 662 (La.1981). The *Jackson* standard does not allow the appellate court to substitute its own appreciation of the evidence for that of the fact-finder. *State v. Pigford*, 05-477 (La. 2/22/06), 922 So.2d 517. Hence, the trial court was not bound by the factual conclusions set forth in *Day*, 158 So.3d 120.

Moreover, the trial court clearly did not ignore our guidance. We affirmed Day's conviction, and we can find no cases on second degree cruelty to juveniles with so light a sentence as that imposed by the trial court on remand. It is

with second-degree burns to his head, face, feet, ankles, and backside. The defendant testified that the burns occurred after he took a bath with the child and the child stayed in the bathtub too long. A physician expert testified that the pattern of injuries suggested the child was dipped into hot water and were not likely to occur when an adult bathed with a child.

The defendant was convicted of second degree cruelty to a juvenile, adjudicated a second habitual offender, and sentenced to serve twenty years at hard labor. We note the evidence did not reveal whether the child's injuries were intentionally or negligently inflicted.

Defendant received the same sentence as the defendants in *Davis*, 890 So.2d 708, and *Dixon*, 852 So.2d 471. We note the strong contrast between the defendants in those cases and Defendant in the instant matter. In *Davis*, 890 So.2d 708, and *Dixon*, 852 So.2d 471, the defendants intentionally injured and traumatized children, and there was no evidence that the children had any pre-existing psychological issues that made them especially difficult to care for to mitigate the abuse. Further, they were second offenders with little candidacy for successful rehabilitation. We also note, in *Vance*, 879 So.2d 862, the defendant received a sentence of twenty years where the evidence did not reveal whether he had intentionally or negligently injured the child, but he was also a second offender, and likely had little chance of rehabilitation.

true that the trial court expressed its difficulty in reconciling this court's remand for resentencing with the jury's verdict against Day for second degree cruelty, but ultimately, the trial court did reduce the original sentence by twenty years. From the ten-year sentence imposed on remand, Day receives credit for time served. Based upon the evidence, that sentence is not excessive.

Indeed, the record reveals a time-line indicating that something happened to G.H. in the summer of 2009 between second and third grade, around six months after he began living full time with his father, Murry Day, and his stepmother, Jaime Day. This coincides with the time frame that Murry Day was more and more absent from the home, and Jaime Day had full control of G.H.

When G.H. entered the third grade at Kaufman Elementary on August 18, 2009, he was very thin, pale, bruised, and had a black eye. His appearance was brought to the attention of the school counselor, Christine Collins, who was notified by three individuals, assistant principal Lynn Hamilton, teacher Nancy Authement, and curriculum coordinator Cathy Berryhill, to check on G.H. Without prompting, G.H. volunteered to Ms. Collins that he had a black eye because he had fallen off his dad's bicycle. He was so thin that it was not until they were talking in her office that Ms. Collins recognized G.H. from the second grade.

Ms. Collins testified that she saw G.H. looking around her office and offered him food. He hungrily ate all of the snacks she offered and then cereal and fruit when she took him to the cafeteria. Once back in her office, G.H. again said he had fallen from the bike. He mentioned other bruises, and Ms. Collins asked him to pull up his pants legs and shirt bottom. She saw deep, raw, pink lines around the front of both ankles, which G.H. explained as scratches from his dog.

She also saw bruises and scars on his chest and stomach, which he claimed were from the bike incident, though some were older. His ribs were showing. When asked about his step-mother, G.H stopped making eye contact and repeatedly said that Jaime was good to him. He said his dad was not home most of the time and that he worked away from home a lot.

Ms. Collins reported the suspected abuse to the Office of Child Services (OCS) via their hotline. Jaime Day came to see her the following day and said not to call OCS anymore because they had already been reported and cleared.[4] Day told Ms. Collins that G.H. was a liar and was manipulative, behavior that Ms. Collins had never observed in G.H. at school. Ms. Collins told Jaime Day that she would continue to report anything that looked suspicious to her. When Ms. Collins talked to G.H. to find out how he was doing, he said Jaime was mad at her after their argument and was mad about his eating at school. Within days she was informed that G.H., and his two step-brothers, were being taken out of Kaufman Elementary. G.H. indicated that he did not want to go. Ms. Collins called OCS, who would disclose no information to her. When she received the records request from Fairview Elementary, she called OCS to report where G.H. was going. Ms. Collins indicated that G.H. had never had behavioral problems at Kaufman, and she would have been the first to know.

On August 21, 2009, Jaime Day took G.H. to his pediatrician, Dr. Rachel Chatters. Day reported that G.H. was getting in trouble at school. She wanted him on medication for ADHD. Dr. Chatters had been his pediatrician since 2003 and had never observed or been told of any behavior or mental problems

---

[4]OCS and a member of the sheriff's office had gone to the Day home on August 14, 2009, to check on G.H. because of his bruises and suggested that he be taken to the hospital. The lack of serious findings resulted in the "clearance" which Jaime Day referenced.

before. G.H. was small for his age but she noticed his weight, only 50.6 pounds. When asked, Day said he was a picky eater. Dr. Chatters ordered thirty-day supplies of liquid supplements, free with Medicaid, sent to his home. Day said it never came. Dr. Chatters examined G.H. and ultimately found that he did not meet the criteria for ADHD. Day did not take G.H. back to Dr. Chatters, and she did not follow up regarding the supplement.

Day sent G.H. to Fairview Elementary on September 1, 2009. He was hospitalized three times in September and October, and his report card showed forty absences.

G.H.'s third grade teacher at Fairview was Sheila Devillier. She testified that G.H. entered class on September 1, thin and pale, with facial bruises, and that the bones in his hands, arms, and neck were very pronounced. When asked about his bruises, he said he fell off of his dad's bicycle and then changed the subject very quickly. Ms. Devillier testified that G.H. was very polite and super bright with high reading skills. When called on to read, he said he was a "very good reader," and he was eager to show her his reading skills. Ms. Devillier testified that during the day, another student discretely told her that G.H.'s ear was bleeding. She wanted to take him to the school counselor to call his step-mother. Ms. Devillier stated that G.H. was very reluctant; he did not want to go home. He liked school and did not want to leave. Ms. Devillier convinced him to go and once there, she motioned to the school counselor to observe the other bruises as well. Ms. Devillier testified that Jaime Day came to open house that night and was upset that she had taken G.H. to the counselor. Day told the teacher in front of the eight-year-old G.H. that he was a liar and manipulative.

9

Devillier cried during her testimony. She testified that on the following day, she admonished G.H. for eating an apple in the bathroom because it was not a sanitary place to eat. G.H. denied the incident but came up to her at recess and apologized for lying. When asked why he was eating in the bathroom, he said he loved food, was greedy about it, and all the food in his house had to be locked away from him; that if it weren't locked away, he would sneak and steal the food. Ms. Devillier went to the counselor at the end of the day, and suspicions were again reported to the OCS. G.H. did not come to school on Friday. The following Monday, September 7, 2009, G.H. walked funny, had fresh bruises on his arms and legs, and had a handprint on his face. At lunch, he asked students near him for the uneaten food off of their plates. Ms. Devillier testified that G.H. consistently missed school on Fridays, which were test days in the morning and educational games and snacks in the afternoon, and that the entire class noticed that he was out on "fun Fridays." She said that a pattern developed, that G.H. would be fine all week, then not there on Friday.

During some absences, Jaime Day came to the school to get work for G.H. She told Ms. Devillier that G.H. could not go to the private school with his step-brothers because of his behavior problems. Ms. Devillier testified that she was surprised because G.H. was mild-mannered, raised his hand, participated in class, and always interacted with her by saying "yes, ma'am" and "thank you." Ms. Devillier testified that she received many notes from Jaime Day, delivered by G.H., wherein Day complained about people giving G.H. food and instructed the teacher not to allow him to eat anything except what she sent in his lunch box. Ms. Devillier said that G.H. was hospitalized several times but always came back to class with his completed schoolwork. In the intervals, she noticed him moving

slowly and taking small steps; once he did not play at recess and said he wanted to observe; once she saw other students helping him to sit down.

In November, Ms. Devillier told the class that she was going on maternity leave for a while. To prepare them, she had several talks with the children. As the time for her leave neared, after one such talk in the morning, G.H. put his head down, crawled underneath the table, and refused to come out for ten or fifteen minutes, during which time he continued to do his schoolwork under the desk. Closer to maternity leave, an incident occurred wherein G.H. defecated in his pants. The procedure was to call the parent for fresh clothes, but none were brought, and Ms. Devillier put G.H. on the bus that afternoon still wearing the soiled clothes. She testified that right before her maternity leave around Thanksgiving, G.H.'s behavior appeared desperate. One day, he intentionally provoked other students, but at recess, she heard him tell two students not to be afraid, that he had to get in trouble, and that he had to have the teacher mark something on his paper that day.

Ms. Devillier returned from her leave in February 2010 and saw G.H. with Jaime Day and his two step-brothers there to get school work or arrange for G.H. to return. She testified that she was excited to see him, and he let her hug him. She described him as small, fragile, and distant, stating that he kept his head down and made little eye contact. She did not see him again.

Her overall impression of G.H. was that he was curious about everything, loved to learn, always asked questions, wanted to know things, and was particularly excited when a McNeese professor came for their science classes. She further testified that he never complained of hunger, and she felt that the disruptions were out of desperation to get a mark in his folder.

11

Polly Fontenot, the Fairview counselor, testified that after open house at the beginning of school, she informed her principal of concerns about G.H., the new student. Jaime Day was called in; she told the principal and the counselor that she was taking G.H. to a 4:30 appointment with a counselor, Sherry Royer. G. H. was not at school the following day. Jaime Day called and told Ms. Fontenot that Sherry Royer had told her to admit G.H. to a mental ward called Four Towers immediately because while at Royer's, G.H. threatened to kill himself and her. Ms. Fontenot testified that she was concerned because G.H. was a very "sweet and pleasant child" and she had not seen anything to indicate that he should be in a mental ward. She called Sherry Royer and told her of the conversation with Day and Day's statement that Royer said to admit him to Four Towers immediately, to which Royer responded that she never said any of those things.[5]

Ms. Fontenot further testified that she never observed or was told of behavior problems when G.H. attended school. She testified to numerous calls from Jaime Day reporting that G.H. had injured himself and had bruises in case

_____

[5] G.H. was hospitalized weighing forty-nine pounds on September 8, 2009, with a perforated ear-drum. Jaime Day told hospital personnel that he was aggressive and self-mutilating and that his *pediatrician* had told her to take him to the emergency room. The pediatrician was Dr. Rachel Chatters, who did not see G.H. after August 21, 2009. He was prescribed Risperdal, an antipsychotic drug used to treat impulse control problems and aggression, without contacting his school for an assessment. He was released on September 16, 2009.

G.H. was hospitalized again on September 26, 2009, at which time Jaime Day reported that he scratched and cut himself, urinated and defecated on himself. None of this behavior occurred during the hospital stays. His medication was increased. He had auditory hallucinations on the Risperdal. He was released on October 2, 2009. While in the hospital, his weight increased to fifty-five pounds.

He was admitted to the hospital again the following day, October 3, 2009, because of a screw-driver through his lip. G.H. said Jaime Day threw the screwdriver at him because he used his brother's shampoo. Jaime Day said he did it to himself while in the bathtub. He was released on October 7, 2009. His weight went up to fifty-seven pounds while in the hospital.

When he was discovered and hospitalized on February 19, 2010, he weighed thirty-eight pounds.

anyone questioned his appearance. These injuries included trying to drown himself in the toilet, scratching his eyelids, and banging his eye on the car door handle. Ms. Fontenot's log indicated that Jaime Day called her on October 20, 2009, to say that G.H. had slipped on a bat in the kitchen and "busted" his head and blackened his eye. She said that Jaime Day called her almost daily to remind her that G.H. was not to be given any food or snacks whatsoever at school, and he could only have what she packed in his lunchbox. Because of all the absences, homebound teaching was authorized in December 2009. When Ms. Fontenot met with G.H. and Jaime Day on January 11, 2010, to set up the home teaching service for G.H., Day's two biological sons were there also, at a separate table playing with hand-held devices. Ms. Fontenot said that G.H. never said a word during the meeting, and she described his appearance as follows:

> [S]he knocked at the door and whenever I opened the door, [G.H.] was standing there with Ms. Day, and it actually took my breath away. He was in a plaid red shirt and it was buttoned all the way up and it was long sleeves, and he had on a dark pair of colored jeans, and he -- and he just kind of had his head down but his lips were all busted up, and he was very, very thin.

Evelyn Vincent, the homebound teacher assigned to G.H., taught school for twenty-three years, and had been a homebound teacher for thirteen years. She saw G.H. four times in February 2010. Ms. Vincent testified that Jaime Day used various excuses to keep her from coming. On February 11, 2010, Jaime said G.H. was sick, so the teacher dropped off the work at the trailer. She testified that the car was there, and the lights were on, but no one came to the door. Later, Day told her that one of the other children had a dentist appointment. Ms. Vincent further testified that when she asked for more hours because G.H. was not getting

13

enough work done, Day told the teacher that she could not do that, that she had other things to do.

Ms. Vincent testified that on February 17 or 18, 2010, Jaime Day said G.H. had torn up his work. Ms. Vincent went to the residence anyway. She indicated that she was so shocked by what she saw that she lost time, as if there had been a time warp. Ms. Vincent described what she saw as follows:

> A    When I got to the house, it was just Mrs. Day that day, and she showed me the work that was on the table, and you could tell that it had been torn in some place. She went to get [G.H.] in the -- down the hallway. I could hear him. And for some reason, I can't answer why, I decided to walk that way. When I got into the hallway, [G.H.] was out of his room, and my eyes said what I saw was a rope in her hand and something around his neck, but it was like this really -- this really couldn't be. I don't even know how I got from the point where I was in the hallway back to the table. I don't know how I got there.
>
> Q    Stop and tell us what you saw.
>
> A    In the trailer, the hallway was right off from the side of the den, and when I walked that way, Jaime was standing there with something in her hand. And at first, my first thought was it was a rope that she kept on the doorknob, because I -- nothing was making sense. It was like you see something but you don't see something, and I never experienced anything like this, so I didn't -- I didn't know what -- it was just -- I don't know how to explain it. And then there was something around [G.H.]'s neck and -- but yet, it was like it was un -- there was a time warp or something there. I -- I just remembered seeing that, but I kept thinking when I -- I don't even know how I got back to the table.

On February 18, 2010, Katy Day, Murry Day's sister, went to visit Jaime, indicating that she would pick up a pizza for lunch. Katy Day brought her own infant, Olivia. She indicated that things had been rocky between her and

Jaime Day because Jaime kept the nephews away from her.  She testified as follows:

> A      . . . in the middle of eating the pizza, I was there maybe ten minutes, I heard [G.H.] in his bedroom saying, "Mama, mama, I'm hungry," and Jaime said, "shut the hell up, [G.H.].  I don't want to hear your shit."
>
> Q      How did you respond, if at all?
>
> A      In my mind, I was -- I did something like a strike one.  It was very, very hard for me because she was so controlling of him.  I asked -- I told her, I said, "well, maybe he wants some pizza.  What kid, you know, doesn't want pizza?"  And she said, "He's already had his lunch.  He's taking a nap."
>
> Q      Okay.  Did he ever come out of his room while y'all were eating the pizza?
>
> A      Never --

Katy Day testified that when she got up to go to the restroom, she saw the following:

> A      And on my way to the restroom, I saw a blue dog leash tied from [G.H.]'s doorknob to [the younger boy]'s doorknob, and I went to the bathroom.  I came out and I said -- I asked Jaime, "Why is that on there," and she said that she keeps that on there because she's afraid that [G.H.] will get out and hurt [the younger boys] in the middle of the night, and it was on during the day.

The younger boys were actually at school at the time.  Katy Day went back to the bathroom after the younger boys came home from school around 3:30.  The leash was off of their doorknob.  She testified that she opened G.H.'s door and saw the following:

> A      I opened the door, and I saw my nine-year-old nephew sitting on the ground shaking really, really, really, really skinny, and the only way that I can describe it is [the] commercials that you see of the Ethiopian boys.  That's what he looked like.  He was really skinny and his room smel[led] like death.

15

Q     When you say, "it smel[led] like death," tell us what you mean.

A     It smelled like somebody -- something was decomposing.

Q     What did you see in the room besides [G.H.]?

A     I saw his bed and a Bible.

. . . .

Q     What was [G.H.] wearing?

A     He was wearing a T-shirt and a diaper.

. . . .

A     I looked at him, and I had to bite my tongue, because he looked horrible.  I said [G.H.], do you know how skinny you are?"  And he said, "No, Nona (sp), I don't."  And I said, "Look at your arm," and he couldn't even lift his arm, because he was shaking so bad, and he just put his head down.  And I asked him, I said, "Baby, you're hungry?  What do you want Nona to go get you? I'll get you anything you want."  I said, "I'll get you McDonald's, a Happy Meal, anything you want."  And he said, "I'm only allowed to eat grits."

. . . .

Q     Where was Jaime Day?

A     She was right behind me, because when I opened that door, she came rushing behind me.

Q     And what did she say?

A     After -- after I saw him in that state when he told me he was not hungry, I walked away into the kitchen and started crying, and Jaime was telling him something I did not hear, and then she shut the door.  And she came in the kitchen and I was getting Olivia's things together, and she said, "Don't feel sorry for him.  He does this to himself."

16

The following day, on February 19, 2010, she called the sheriff. Officer Jason Schnake was the first officer to go to the home of Jaime and Murry Day. He testified as follows:

> Q    And you walked into the house. Were there any other children there?
>
> A    No ma'am.
> Q    And when you went into [G.H.]'s room and looked in his room, tell us what you saw.
>
> A    I saw a very thin, sickly child.
>
> Q    What did he look like?
>
> A    The way that I have explained it to anybody who has asked me about that day, the only thing that I can relate it to is there's a movie out there with Brad Pitt, Seven. And there's a very very sickly thin person that they thought was dead laying on the bed. And that's the only way I can describe it. Horrific.
>
> Q    And is that what you thought when you looked at [. . . G.H.].
>
> A    I thought that this wasn't right.
>
> Q    And what did you do?
>
> A    I immediately called my supervisor because I knew something had to be done.
>
> Q    And you did that?
>
> A    Yes, ma'am (crying).

G.H., who was twelve at the time of trial, testified that a diagonal scar on his upper lip was from Jaime hitting him with a chipped blue dustpan. He identified an x-shaped scar on his upper lip as the result of Jaime throwing a screwdriver at him while he was in the bathtub because he had used his brother's shampoo. G.H. testified that he had to tell others that he inflicted those injuries on himself because Jaime wanted him to look psychotic; he was afraid of her and did

17

what she said to avoid beatings. He identified a circular scar on his stomach as a burn from a hairdryer, inflicted by Jaime one morning after she told him to wash his hair, and he got his shirt wet in the process.

G.H. further testified that a large scar on his back was the result of Jaime kicking him in the back multiple times in the hallway because he was not doing jumping jacks correctly. She treated the wound by holding a sock of hot rice on it, which burned and left a large blister; then she popped it and scrubbed it with soap. He further testified that Jaime had tied him in his bed with saran wrap to keep him from coming out of his room to get food; and after that, she used a dog leash tied to the door knobs. He said he ate on the floor in his bedroom and was ultimately limited to noodles, grits, and rice; he was made to eat salt; she hung him upside down by a rope around his ankles from a hook on her bathroom door, with his face to the door, while she was in the bathtub with the two younger boys. He said she took him down before Murry got home, and he hit his forehead on the toilet, causing his head to bleed.

G.H. further testified that Jaime told him to throw tantrums and act crazy at school, bang his head, hurt himself, and defecate in his pants, which he did to avoid beatings. He said she made him put his head down and ignore the homeschool teacher; that, in making the video, she made him cry, and when he stopped crying, she mimicked crying to signal him to start again. He also said she told him to hit himself in the face with his book in front of his dad, which made his nose bleed. Then she told the dad that G.H. did it because he was psycho. G.H. testified that Jaime made him eat handfuls of salt, saying that it would kill his brain cells and then he would die. When the police came, he said she made him eat four

18

pieces of bread before they came inside, and she told him to misbehave and scratch his face and be a psycho.

Subsequently, the blue dog leash and the rice-filled sock were found by police in trash-bags in the garbage bin under Jaime Day's carport.

In this court's prior decision finding the thirty-year sentence excessive, testimony was summarized indicating that G.H. scratched himself and threatened to hurt himself. He also had problems with food and threw tantrums while in foster care after he was removed from Jaime Day's household. However, his conduct while in foster care came after Day's starvation and neglect of G.H., which followed a different kind of abuse from G.H.'s biological mother.

Karla Semien, G.H.'s first foster parent had seven other children in the home and had no training for dealing with a child who had been starved. She documented that the first thing G.H. did upon entering her house was to go straight to the pantry to see if there was food in the house, typical behavior for a child who has been starved according to expert testimony. Further, Ms. Semien journaled that when she tried to put G.H. in the bath on the first night, he became hysterical, had a full-on panic attack, and was unable to breathe. The following day, G.H. explained to Ms. Semien that Jaime had tried to drown him. As time progressed, and she was unable to assure him how much longer Jaime would be in jail, G.H.'s anxiety grew, and his behavior grew problematic. G.H. left her care after approximately six months.

Susan Sportsman, G.H.'s second foster parent, was a bookkeeper at the school where G.H.'s teacher and the school counselor had reported suspected abuse of G.H. Ms. Sportsman had no children at home. She and her husband obtained a special certification in order to take G.H. into their home. He was with

them for over three years before they had to transfer out of state because of her husband's work. She described G.H. as a brilliant little boy who was curious, who loved school and learning, and who made very good grades. She visited him and spent time with him after she moved away. In her testimony, she attributed 99.9 percent of G.H.'s outbursts to food issues.

**Medical Testimony**

Dr. Charles Murphy, a psychiatrist who treated G.H. for three hospitalizations while G.H. was in the care of Jaime Day, testified that G.H. was manipulative and attention-seeking to the extent of urinating and defecating in various places, including on himself, because he was angry at being punished. However, none of this behavior occurred during the hospital stays: no aggression, no self-mutilation, no impulse control problems or depressive behavior, and no refusal to eat. In fact G.H. gained weight each time he was hospitalized. Dr. Murphy admitted that Jaime Day was the primary source of information regarding G.H. The record reveals that most of the reports of G.H.'s behavioral problems came from Jaime Day, as she was the adult relating her complaints to social and medical service providers. Dr. Murphy indicated that mood swings, wherein G.H. went quickly from sad to happy to anxious, were consistent with an abused child.

Noting the preexisting neglect by the biological mother and the step-mother's status as a first time offender, a panel of this court instructed the trial court to reduce Jaime Day's sentence. However, the panel did not overturn the defendant's conviction as there was abundant testimony of criminal negligence and abuse. Other medical opinions were summarized in the previous appeal as follows:

20

### Dr. McCanless' testimony

Dr. Edgar McCanless, a pediatrician, examined G.H. multiple times after his February 19, 2010 hospital admission. G.H. weighed thirty-eight pounds, which was below the fifth percentile on a growth chart for children. Dr. McCanless testified that G.H. had obvious signs of physical abuse and malnourishment, including a black eye, a bruise to the left upper lip, a scar from a laceration on his upper lip, blisters inside his left ear, a small scab above the buttocks crease, a large burn scar on his back, a distended abdomen, edema of the legs and lower body parts, which was caused by low serum proteins in the blood as a result of starvation, anemia, low body temperature, and a fine coating of hair on his face, called lanugo, which was a result of starvation. Dr. McCanless testified that G.H. was later diagnosed with depression and posttraumatic stress disorder. Finally, Dr. McCanless testified that he had never seen a child near G.H.'s age intentionally starve himself or sustain such self-inflicted injuries.

### Dr. Benton's Testimony

Dr. Scott Benton, an expert pediatrician for the state who specializes in child abuse pediatrics, testified that a "classic" symptom of starvation abuse is later food hoarding and that in each of the starvation abuse cases he had experienced, the children later hid food in unusual places and had arguments with their caretakers over food. He testified that he had never seen a child in G.H.'s age group self-starve, explaining that this behavior was usually observed in teenagers who were purposefully trying to lose weight. He found significant that, in each setting where G.H.'s access to food was not restricted, he ate. Regarding G.H.'s allegations that he ate his own feces and drank his own urine, Dr. Benton testified that eating feces or drinking urine is "typical of a starved child." He testified that G.H.'s later tendencies to hide food, to check for food in the home, and to disagree with throwing away leftovers were behaviors consistent with that of a starved child. He testified that he did not feel that G.H.'s injuries, which were documented in the medical records and photographed, were self-inflicted, explaining that the "severity" of the injuries exceeded the typically superficial nature of most self-inflicted injuries.

*Day*, 158 So.3d at 139.

Dr. Scott Benton, MD, FAAP, is also Chief of Pediatric Forensic Medicine at the University of Mississippi Medical Center in Jackson, Mississippi. He testified at trial and was accepted as an expert in general pediatrics and in child abuse pediatrics. He noted several cases where the children had suffered the exact treatment that G.H. had suffered. Dr. Benton also wrote a letter to the trial court, wherein he opined as follows:

> I have examined tens of thousands of maltreated children since 1994. Very few of those cases epitomize the term cruelty like Jaime Day's treatment of [G.H.]. Also atypical is that much of the cruelty manifest by Jaime Day was premeditated.
>
> [G.H.] specifically exhibited a degree of starvation that took place over time and was clearly recognized by his peers and teachers as hunger. One cannot get to the degree of malnutrition in [G.H.]'s case over a short period of time and his degree of starvation was equivalent to fatal starvation cases I have been consulted on that ended in death. Starvation to this degree has permanent effects on a growing brain and heart. Due to his extreme case of intentional starvation, [G.H.] will be at higher risk of future high blood pressure, strokes and primary heart dysfunction.
>
> Jaime Day's self-made video tape stands as a window into her emotional abuse of [G.H.] and likely reflects her best public persona. Jaime Day's absence of empathy and continuous degradation of [G.H.] are well recognized to cause toxic stress with a permanent effect on [G.H.]'s brain functioning. The emotional abuse is likely a contributing factor of his Post Traumatic Stress Disorder. Trust issues pervade [G.H.]'s functioning and even with competent mental health attention, he is likely to have chronic trust issues in his future relationships.
>
> It is unconscionable for Jaime Day to be the proximate cause of [G.H.]'s second and third degree inflicted burns and then to have denied him proper medical attention for his burns. Pain control and prevention of infection require prompt medical attention. As I testified, I worked on a burn team for about seven years. Burns cause agonizing pain and the degree and size noted on [G.H.] would have required narcotic pain relievers.

There are now over 50 scientific papers describing the long term impact of adverse childhood events (ACE). These papers collectively report on what is known as the ACE Study. The combination of the prolonged physical abuse and emotional abuse are adverse childhood events in the meaning of these studies. The impact on future physical and mental health in these studies were directly correlated to the number of "doses" of adverse childhood events. More importantly, research is showing that these events appear to be causing permanent and/or long-term effects by changing our genetic program and altering the brain's architecture in how it responds to future stress. These changes manifest in a predictable way such as detachment, numbing, compliance, fantasy, hyper vigilance, aggression, anxiety, exaggerated responses that can cause misidentification with or coexist with ADHD, ODD, conduct disorder, bipolar disorder and anger management difficulties.

In summary, [G.H.] suffered premeditated cruelty by Jaime Day that had immediate and severe physical consequences (pain, suffering, hunger, skin scarring, and permanent brain and heart alterations) and will have long term consequences.

**Testimony of Dr. Lawrence Dilks**

Dr. Lawrence Dilks, Ph.D., was accepted as an expert in clinical neuropsychology. His specialty is brain behavior relationships. Among other positions, he sat on the child abuse committee at Fort Polk and assisted the Vernon Parish Child Abuse Office. He has also worked at various times with Calcasieu Parish OCS, more recently called the Department of Children and Family Services (DCFS). Dr. Dilks treated G.H. after he was removed from the Day home and placed in foster care. Dr. Dilks looked at all of G.H.'s hospitalizations while he was in the care of Jaime Day and noted the wide variety of frequently changing diagnoses which he found perplexing. He also noted that diagnoses changed from admittance to discharge in a single hospital stay. The diagnoses included depression and suicidal ideation, sadness (which is not the same as depression),

23

mood disorder, behavior disorder, and adjustment disorder, the weakest of all psychiatric diagnoses. He noted disagreements in diagnoses within a single stay, and commented on the physicians' and hospital personnel's numerous remarks that G.H.'s behavior in the hospital did not match the behaviors complained of by the adult admitting him. During one hospitalization, G.H. was admitted with a significant diagnosis of self-abuse, but was discharged with only a mood disorder.

Dr. Dilks further saw a pattern with all of G.H.'s hospital stays wherein he rapidly reorganized psychologically after being admitted. In other words, he got better really quickly in the hospital. Dr. Dilks diagnosed G.H. with complex post-traumatic stress disorder, which indicates that the person has been in a traumatic situation for a long period of time, such as soldiers in Viet Nam and Iraq. When he first examined G.H. in April 2010, he observed a lot of scars, and Karla Semien related that G.H. had gone from thirty-eight to forty-seven pounds during the month he had been with her, and that his behavior was improving dramatically. She reported a lot of anxiety and fear in G.H. that Jaime Day would hurt him if she was released from jail. G.H. was having nightmares, flashbacks, intrusive thoughts, and panic attacks. He did not like being in many of the rooms of Ms. Semien's house because he was reminded of the abuse in those kinds of rooms, kickings in the hallway, starvings in the kitchen, and hanging upside down from a door. He panicked when Ms. Semien cooked rice and when he broke something, because he feared punishment. He was surprised when he was not punished. He would not go into a bedroom by himself. They were having toileting problems. Dr. Dilks said that all of these behaviors were indicative of complex post-traumatic stress disorder.

Dr. Dilks explained that traumatized children, and even adults, have difficulty talking about events or effectively expressing themselves verbally, so he has them draw the components of the traumatic events. He used this method with G.H. and explained numerous drawings for the jury as they were projected on the screen in the courtroom. G.H. had drawn himself tied in his bed; hanging upside down from a hook; with a black eye; and in the bathtub with Jaime throwing a screwdriver at him. There were separate drawings breaking down the action, such as the screwdriver on the table, Jaime picking it up, her arm moving through positions as she raised it, her releasing the screwdriver, the screwdriver in the air, G.H. in the bathtub, and the screwdriver hitting G.H. He also drew the hook, the rope, and his feet. He drew Jaime kicking him in the hallway with the caption, "said don't flinch." G.H. drew Jaime sitting on the couch and burning his back with the sock of rice while he depicted himself face down on the floor. Dr. Dilks testified that G.H. refused any conversation about sexual abuse.

The video made by Jaime for the purpose of showing how G.H. threw tantrums and hurt himself was particularly disturbing to this court. The hateful tone and language used by the defendant as she "contained" G.H. on his knees in the living room, while G.H. cried and begged her not to institutionalize him, stands out in stark contrast to the "loving mother" and the "life in the church" that the defendant attempted to portray. G.H. told Dr. Dilks that during the video, Jaime was telling him to act out. Dr. Dilks confirmed that parts of the video were staged as he observed subtle gestures and cues indicating staging. He further said that G.H. was degraded during this twenty-five minute video, but yet he never moved, or went out of focus on the camera. Dr. Dilks said he had never seen a temper tantrum where the child did not move somewhat, lie on the floor, scream, run

25

around the room, yell, curse, make threats, or throw things. In his opinion the video was choreographed by Jaime. When the video was shown to the jury, one of the jurors called out, "Do we have to watch this?" The tape was stopped after the first five minutes. G.H. told Dr. Dilks that Jaime made him "act crazy" when people came to the house, and when interacting with mental health professionals, especially Dr. Murphy.

## Letters to the Court on Resentencing

For the resentencing hearing, the trial court received letters from G.H.'s paternal grandmother, a former R.N. with whom G.H. lives, and from a current aunt, who was a health care provider at the hospital when G.H. was admitted in February 2010. Both asked the trial court not to reduce Jaime Day's sentence, pointing out that the abuse and neglect of G.H. was not a one-time offense, or a matter of a spanking that got out of hand; rather, it was repeated, long-term physical and mental abuse that would plague G.H. for the rest of his life.

G.H.'s grandmother described G.H.'s fourteenth birthday celebration, stating that over sixty people were in attendance, including law officers, doctors, counselors, and health workers in addition to family. She stated that signed petitions were collected and attached to show the community's interest. She further indicated that she learned that many calls were made to DCFS by teachers, counselors, neighbors, and strangers, on G.H.'s behalf, but basically, the system failed him. She further described Jaime Day's callousness and lack of remorse in the ER on February 19, 2010, stating that Day angrily pointed her finger at G.H. and said, "I am NOT going to jail over this. Do you hear me?"

26

Additionally, G.H. himself, now fourteen, provided the court with his own victim impact statement. He stated the same things he had told the foster parents and Dr. Dilks at age nine, and the trial court at age twelve. He recounted the events of abuse, manipulation, and control by Day, his continuing fear of her, his embarrassment, nightmares, and flashbacks.

In *State v. J.S.*, 10-391 (La.App. 3 Cir. 11/3/10) (unpublished opinion),[6] a first-offender female defendant pled guilty to two counts of second degree cruelty to a juvenile, and three counts of the same offense were dismissed. That defendant's offenses arose from the mistreatment of a child under the age of seventeen where the mistreatment resulted in a fracture of the child's cranium. The defendant was sentenced to serve thirty years at hard labor on each count, with eighteen years of each count suspended. The remaining twelve-year incarceration sentences were ordered to run concurrently. However, she was also sentenced to two, five-year probation sentences, which were to run consecutively at the end of the incarceration sentences. Our court affirmed the sentences, noting that the defendant was a first offender and had benefitted from a plea bargain.

Here, based on the evidence in the thirty-seven volumes that comprise the record in this case, we do *not* find that the ten-year sentence imposed on Jaime Day on remand was excessive. While the defendant contends that this court has authority to reverse and render a new sentence without further remand, La.Code Crim.P. art. 881.4(A) provides: "If the appellate court finds that a sentence must be set aside on any ground, the court shall remand for resentence by the trial court. The appellate court may give direction to the trial court concerning the proper sentence to impose." Thus, our function as the reviewing court is to provide

---

[6]This case can be found using Westlaw citation 2010 WL 4325831.

guidance in resentencing, as we did previously, and we are without authority to impose a sentence of our own.

### *Violation of La.Code Crim.P. art. 894.1*

Jaime Day also contends that the trial court erred by imposing an unlawfully excessive sentence in violation of La.Code Crim.P. art. 894.1 as well as the state and federal constitutions.  However, she has made no argument that the trial court failed to particularize her sentence; nor has she alleged how the trial court failed to comply with La.Code Crim.P. art. 894.1.  Pursuant to Uniform Rules—Courts of Appeal, Rule 2-12.4, "[t]he court may consider as abandoned any assignment of error or issue for review which has not been briefed."  Because the defendant failed to specifically address this issue, we find that she abandoned her claim regarding Article 894.1.

### V.

### <u>CONCLUSION</u>

Based upon the foregoing, the sentence imposed upon Jaime Day for second degree cruelty to a juvenile is affirmed.  Costs of the appeal are assessed against the defendant, Jaime Day.

**AFFIRMED**.